UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE  DIVISION

| | |
|---|---|
| THE SIERRA CLUB, THE CHEMICAL ) | |
| WEAPONS WORKING GROUP, CITIZENS ) | |
| AGAINST INCINERATION AT NEWPORT ) | |
| (CAIN), COMMUNITY IN-POWER ) | 2:07-cv-0101-LJM-WGH |
| DEVELOPMENT ASSOCIATION (CIDA) ) | |
| SARA MORGAN, LEONARD AKERS, ) | |
| HILTON KELLY, MOYA GREEN, and ) | |
| ANISHA SWALLOW, ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| DR. ROBERT M GATES, Secretary of ) | |
| Defense, PETE GREEN, Secretary of the Army,) | |
| UNITED STATES DEPARTMENT OF ) | |
| DEFENSE, UNITED STATES DEPARTMENT) | |
| OF THE ARMY, and VEOLIA ) | |
| ENVIRONMENTAL SERVICES, INC., ) | |
| Defendants. ) | |

## ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

This cause is now before the Court on plaintiffs', the Sierra Club, the Chemical Weapons

Working Group ("CWWG"), Citizens Against Incineration at Newport ("CAIN"), Community In-

Power Development Association ("CIDA"), Sara Morgan, Leonard Akars, Hilton Kelley, Moya

Green and Anisha Swallow (collectively, "Plaintiffs"), Motion for Preliminary Injunction. Plaintiffs

seek to enjoin defendants, Dr. Robert M. Gates, Secretary of Defense, Pete Green, Secretary of the

Army, United States Department of Defense, United States Department of the Army ("Army")

(these defendants, collectively, the "Government"), and Veolia Environmental Services, Inc.[1]

---

[1]The Court notes that Veolia has notified the Court that the proper defendant for purposes of Plaintiffs' claims is Veolia ES Technical Solutions, LLC.  Neither entity disputes that it had an opportunity to be heard on the issues related to the matters addressed in this Order.

("Veolia") (all defendants, collectively, "Defendants"), from continuing shipments of the product of the hyrdrolysis of chemical warfare agent VX ("CVXH" or "hyrdolysate") from the chemical weapons depot in Newport, Indiana ("NECD") to Veolia's incineration facility in Port Arthur, Texas, and to enjoin Veolia from incinerating CVXH in Port Arthur.  Plaintiffs assert claims under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a), the Defense Authorization Act ("DAA"), 50 U.S.C. § 1512 *et. seq.*, and under Indiana and Texas State law against all Defendants, and asserts claims under the National Environmental Policy Act ("NEPA"), against the Government.

The parties have briefed the issues, and on July 16-18, 2007, the Court held a hearing on the matter.  For the reasons stated herein, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction.

## I. BACKGROUND

### A. THE GOVERNMENT'S CHEMICAL WEAPONS DESTRUCTION PROGRAM & THE CONTENT OF THE ADMINISTRATIVE RECORD REGARDING THE GOVERNMENT'S PLAN FOR DESTRUCTION OF VX STORED AT NECD

Generally, the disposal of the Government's stockpile of chemical weapons is governed by Congressional mandate, *see* 50 U.S.C. § 1521, and by the Chemical Weapons Convention ("CWC"), an international treaty entered into by the Government in 1993.  *See* Convention on the Prohibition of the Development Production, Stockpiling, and Use of Chemical Weapons and their Destruction, Aug. 8, 1994, art. IV, para. 6, 32 I.L.M. 800 (entered into force Apr. 29, 1997).  The Organisation for the Prevention of Chemical Weapons, the international organization that implements the CWC, has set a deadline for destruction of chemical weapons of April 29, 2012.  Lyle Decl. ¶ 4.

The Army originally stored approximately 1,269 tons of VX at NECD.[2]  Brubaker Decl. ¶ 4.  VX is an organophosphate that is an odorless, tasteless liquid with an appearance similar to motor oil.  Kavanagh Decl. ¶ 5.  VX can become an aerosol of very small droplets through explosion or become a vapor through ignition.  *Id.*  It is more dense than water and evaporates 2,000 times more slowly than water.  *Id.*  The VX at NECD is stored in steel one-ton containers.  *Id.*

On February 26, 1988, the Government published its notice of the Record of Decision ("ROD") regarding the Final Programmatic Environmental Impact Statement ("FPEIS") for its Chemical Stockpile Disposal Program.  53 Fed. Reg. 5816-02 (Feb. 26, 1988).  The notice stated that the Army had selected the on-site disposal alternative for all eight chemical storage sites out of the following alternatives:  (1) on-site destruction at each storage site; (2) regional destruction, at Anniston Army Depot for the Eastern storage installations, and Tooele Army Depot for the Western storage installations; (3) national destruction at Tooele Army Depot; (4) continued storage at all storage sites.  *Id.*  The notice also stated that

> [a] site-specific [NEPA] review, which will include the preparation of an Environmental Impact Statement (EIS) or Environmental Assessment (EA), will be conducted for each of the eight chemical storage installations.  In addition, the Army is obligated to obtain [RCRA] and Clean Air Act [("CAA")] permits from each of the affected status and the Environmental Protection Agency [("EPA")].

*Id.*

In 1994, the National Research Council ("NRC") published a report (the "NRC report") entitled "Recommendations for the Disposal of Chemical Agents and Munitions," in conjunction with the Committee on Review and Evaluation of the Army Chemical Stockpile Disposal Program, the Board on Army Science and Technology, and the Commission on Engineering and Technical

---

[2]NECD is designated for closure by September 2011 under the 2005 Base Realignment and Closure Act ("BRAC").  Kutz Decl. ¶ 3.

Systems.  Admin. R. Doc. No. 41.  Essentially the NRC report approved of the Army's plan to date, but encouraged the Army to keep the public abreast of new developments as site-specific risk assessments became available.  *Id.* at 120-31.  The report makes very few site-specific recommendations.  *See, generally*, *id.*

Apparently, in June 1994, Congress appropriated additional funds for the Army to aggressively consider development of alternatives to the chosen baseline process, incineration, as the means of agent destruction at bulk-only storage sites, including Aberdeen, Maryland, and NECD.[3]  S. Rep. 103-321, at 351 (July 29, 1994).

In December 1998, the Government published its Final Environmental Impact Statement (the "1998 FEIS") to pilot test its neutralization plan for the VX at NECD.[4]  Admin. R. Doc. No. 1.  The Army evaluated only two alternatives, no-action and the proposed process.  *Id.* § 2.  As described by the 1998 FEIS, the plan recommended by the Army was to neutralize the VX at a Newport Chemical Agent Disposal Facility ("NECDF"), to be built adjacent to NECD, using a caustic neutralization of the VX to form a caustic VX hydrolysate or CVXH, followed by on-site Super Critical Water Oxidation ("SCWO") treatment to eliminate organic compounds in the CVXH.  *Id.* § 2.5.

---

[3]The Court notes that this fact is referenced in the Government's brief without citation to either the administrative record or to any congressional record.  The citation provided by the Court best supports the Government's proffered fact.

[4]This paragraph begins the Court's factual findings with respect to the administrative record.  For clarity, the Court chose to present the content of the administrative record chronologically rather than in the haphazard way the Government presented it to the Court.  The Court finds that the nature of the administrative record in this case, alone, justified the Court's decision to allow testimonial evidence at the hearing to supplement the record.

In February and April 1999, the Edgewood Chemical Biological Center published two reports on the residual VX concentration in various aspects of the CVXH produced on lab scale models of the process to be used at NECDF. *Id.* Doc. Nos. 38 & 37. The February 1999 report was entitled: Quantitative Analysis of Residual VX in Caustic Neutralization Solutions by Solid Phase Extraction and GC/MSD: Analysis of Hydrolysate as Separated Organic and Aqueous Phases (the "CVXH Separate Phase Study"). *Id.* Doc. No. 38. The CVXH Separate Phase Study summarized the methods development and validation efforts for the quantization of VX in caustic neutralization solutions. *Id.* at iii. In this study, the scientists calculated a "method limit of detection" and a "method limit of quantitation [sic]" for each of the organic phase and the aqueous phase of the CVXH produced by the hydrolysis process planned for NECDF. *Id.* This Study reported that the overall method limit of detection in the organic phase was 57 parts per billion ("ppb") VX and the overall method limit of detection in the aqueous phase was 1 ppb VX. *Id.*

The second study was entitled: Quantitative Analysis of Residual VX in Caustic Neutralization Solutions by Solid Phase Extraction and GC/MSD: Analysis of Hydrolysate as Unseparated Phases (the "CVXH Unseparated Phases Study"). *Id.* Doc. No. 37. The CVXH Unseparated Phases Study summarized the methods development and validation efforts for the quantization of VX in unseparated CVXH. *Id.* at iii. This Study reported that the overall method limit of detection was determined to be 4 ppb VX for the unseparated CVXH. *Id.*

In 2000 the National Research Center ("NRC") published a study (the "2000 NRC study") in which it evaluated the Army's plan to use chemical hydrolysis followed by SCWO to neutralize VX at NECD. *Id.* Doc. No. 7. The study recommended that the Army evaluate off-site waste management of CVXH for cost and scheduling benefits, and as a contingency plan in case of start-up problems with SCWO. *Id.* at 1.

5

In December 2001, the NRC published a report (the "2001 NRC report") of an ad hoc committee's review of the proposed process changes at NECD for expedited disposal of the VX stockpile there.  *Id.* Doc. No. 27.  The proposed changes compared neutralization of VX in the ton containers in which it was stored, followed by disposal of the containers at a commercial post-treatment facility or treatment, storage, and disposal facility ("TSDF"), with neutralization of VX using caustic solution in stirred tank reactors, followed by disposal of CVXH at an off-site TSDF.  *Id.* at 2-3.  The 2001 NRC report recommended that the Army pursue the stirred-tank reactor concept for expedited destruction of the VX at NECD.  *Id.* at 5.

In part in response to the NRC studies, and in other part in response to the terrorist attacks of September 11, 2001,[5] in July 2002, the Army published a "Final Environmental Assessment" (the "2002 FEA") regarding the VX destruction process proposed for NECD.  *Id.* Doc. No. 3.  The 2002 FEA compares a "no-action" alternative[6] to disposal of CVXH at an off-site TSDF.  *Id.* § 1.  The 2002 FEA maked no site-specific findings with respect to a TSDF, suggesting that such analysis would be performed later after a TSDF was chosen.  *Id.*  The Army stated in the 2002 FEA that CVXH would be classified as a hazardous waste under Indiana regulations unless the SCWO treatment option was employed, in which case the effluent would be delisted and classified as nonhazardous.  *Id.* (citing Appendix B).  The 2002 FEA states that it

---

[5]The Army stated that the Presidential Proclamation of a National Emergency on September 14, 2001, in light of the "continuing and immediate threat of further terrorist attacks on the United States . . . the Army determined that it is necessary for the stockpile of VX as NECD to be destroyed expeditiously and in a manner that does not pose a threat to public health and the environment."  Admin. R. Doc. No. 3, § 1.

[6]The "no-action" alternative cited was the use of the hydrolysis process and storage of the CVXH at NECD until problems encountered in scale-up of the SCWO process could be rectified.  *Id.* Doc. No. 3, § 1.

6

> primarily addresses impacts that could occur in the vicinity of NECD. It is recognized that some impacts that would be avoided or reduced at NECD could be transferred to a receiving TSDF. However, the permitted off-site TSDF selected for treatment and disposal of NECDF waste streams would be audited to ensure that the facility is safely treating the hydrolysate in accordance with applicable federal, state, and local regulations and the TSDF's environmental operating permits. These regulations and permits would ensure that disposal of the liquid effluents from the NECDF would be conducted in a safe and environmentally acceptable manner.

*Id.* § 1.2.

The 2002 FEA-recommended process included neutralization of the VX at NECDF followed by off-site treatment of CVXH at a RCRA-permitted TSDF for disposal. *Id.* § 4.

On May 21, 2002, the Army held an informational public meeting in Newport, Indiana, regarding the findings published in the 2002 FEA. *Id.* § 5. The 2002 FEA was presented and reviewed by various federal, state and local elected officials and regulators, as well as various federal agencies. *Id.*

In conjunction with the 2002 FEA, the Army also issued a Final Finding of No Significant Impact (the "2002 FONSI"), which issued on October 28, 2002. *Id.* Doc. No. 4. The 2002 FONSI stated that the Army had received written comments on its proposal from a forty-five-day period that started on August 28, 2002, and ended on October 12, 2002. *Id.* at 3. The 2002 FONSI stated, in relevant part:

> The only substantive comment on the proposed alternative was the objection to the use of an off-site incinerator or deep well injection TSDF. This comment was received verbally at the public meeting and in a petition signed by [fifty-two] area residents (attached as Appendix B). Since the [2002 FEA] and the FONSI do not deal directly with the type of technology to be used at the commercial TSDF, the Army will consider these comments during the selection of the TSDF. The comments received did not alter the Army's proposed path that was put forward in the conclusion of the [2002 FEA] and the Draft FONSI.

*Id.*

Between October 2002, and April 2007, the Army considered several aspects of the plan proposed in the 2002 FEA and the 2002 FONSI. *See* Admin. R. Doc. Nos. 33, 36, 24, 16, 20, 15, 21, 13, 43, 8, & 34. For example, in December 2003, the U.S. Army Chemical Materials Agency (the "CMA") issued a study ("2003 Transportation Analysis") that evaluated the potential impacts to the human population and environmental resources along two routes from NECD to a specific TSDF, the DuPont Environmental Treatment facility in Stillwater, New Jersey ("DuPont"), which is the largest commercial and industrial waste water treatment plant in the world. *Id.* Doc. No. 16. The 2003 Transportation Analysis included a characterization of CVXH, with a comparison of the waste water to the Indiana Department of Environmental Management ("IDEM") standard for the maximum allowable VX concentration level, and the department of transportation ("DOT") classification of CVXH as a hazardous material because of corrosivity and, possibly, flammability. *Id.* at 2-3. These ratings were premised on a VX loading of 33% in the reactive mixture before hydrolysis. *Id.* at 2-3. The 2003 Transportation Analysis also describes the packaging and shipping standards to be used by the Army for transport of CVXH to the selected TSDF. *Id.* at 4.

With respect to the possible routes and their characteristics, the report stated:

> The Army has identified the DuPont Environmental Treatment facility in Deepwater, New Jersey, as a TSDF capable of treating and disposing of the NECDF [CVXH]. Because of the large highway distance between this facility and the NECDF, the Deepwater location has been selected for use in this transportation analysis for the purpose of providing an upper bound on the distances and travel times that would be needed during the off-site shipping campaign. Any other facility selected by the Army to treat or dispose of the Newport [CVXH] would likely be closer to the NECDF, and the shipping routes to this other facility would therefore be shorter and would likely pass near fewer people and fewer environmental resources than the two Deepwater routes used for analysis in this report.

*Id.* at 5.  The report then analyzed the environmental impacts for two different routes from Newport, Indiana, to Deepwater, New Jersey.  *Id.* at 5-18.  The only risk assessed by the report is the risk related to accidents along each of two routes.  *Id.* at 12.

In addition, the 2003 Transportation Analysis discussed the TSDF requirements.  *Id.* at 18-21.  This portion of the report addressed the environmental impact of processing CVXH in a biological degradation process.  *Id.* at 18.  The report stated:  "The DuPont Environmental Treatment facility in Deepwater, New Jersey, currently has all [applicable licenses and permits, as required by federal, state, and local regulatory authorities] as related to the receipt, treatment, and disposal of the liquid process effluent from the NECDF."  *Id.*  This section of the 2003 Transportation Analysis also addressed environmental justice concerns in the community surrounding the Deepwater, New Jersey, facility.  *Id.* at 18-20.

The conclusion of the 2003 Transportation Analysis is broader than the specifics of its analysis:

> The U.S. Army's intent to ship the NECDF [CVXH] to a permitted TSDF does not pose any unique transportation safety concerns or unacceptable environmental impacts relative to those associated with routine commercial and trade industry hazardous waste due to its corrosive nature, which is similar to that of liquid household drain cleaner.  The proposed off-site treatment and transport of process effluent is not likely to produce any significant impacts to human health or the environment.

*Id.* at 21.

The administrative record also contains an Evaluation of Issues Identified in the Independent Assessment of Hydrolysate Treatment and Disposal in Dayton, Ohio ("Dayton Issues Report"), dated December 2003, written by Science Application International Corporation ("SAID").  *Id.* Doc. No. 20.  The independent analysis was done to provide advice to Montgomery County, Ohio, officials regarding the proposal to treat CVXH at Perma-Fix of Dayton ("PFD"), a TSDF.  *Id.* at 1.

9

The Dayton Issues Report addressed the issues raised by the independent analysis in an effort to provide a counter argument to the key concerns and recommendations contained in the independent analysis.  *Id.*  In response to the question of implementing the proposed process at PFD under full-scale operations, the Dayton Issues Report suggests that

> [t]reatment of [CVXH] at any TSDF would first involve a comprehensive treatability study to determine the optimum operating conditions for this waste type, which is common commercial practice. . . .  The overall intention of the project would be to integrate controlled startup of hydrolysate treatment at the TSDF with the scheduled slow ramp-up of agent destruction at NECDF.  The Army and Parsons believe treatment of hydrolysate at a TSDF is amenable to full-scale implementation, although a closely monitored phased startup of the TSDF treatment of hydrolysate is warranted.

*Id.* at 7.

A third party, Mitretek Systems, Center for Science and Technology, also reviewed the independent analysis performed at PFD as well as the Government's response to the analysis, then issued a report of its findings in March 2004 (the "Mitretek Report").  *Id.* Doc. No. 21.  Generally, the Mitretek Report concurred with the Government's assessment of the classification of CVXH, recommended that "[a]ny TSDF selected to treat Newport [CVXH] should conduct a treatability study appropriate for their specific process, and recommend[ed] that the Government continue to correct all misinformation concerning CVXH in the public domain."  *Id.* at 7-2 to 7-3.

Also in March 2004, DuPont issued its own treatment, transportation safety assessment, and risk management plan of the Government's proposal to treat CVXH at its facility in Deepwater, New Jersey (the "DuPont 2004 Assessment").  *Id.* Doc. No. 15.  Based on a treatability study, the DuPont 2004 Assessment concluded that DuPont's Deepwater, New Jersey, facility could effectively treat CVXH generated at NECDF.  *Id.* at 59.  It also suggested a preferred transportation route given the

nature of CVXH and using "existing methodologies developed or used by various government agencies . . . ." *Id.* at 1-4.

In April 2005, the Army filed a Record of Environmental Consideration ("REC") (this REC in particular, the "April 2005 REC") in which the Parsons Infrastructure and Technology Group ("Parsons") announced that it would start neutralization of the VX at NECDF. *Id.* Doc. No. 43. According to the April 2005 REC, the hydrolysate generated from the process would be stored on-site until a suitable arrangement could be made for treatment at a TSDF. *Id.* The April 2005 REC also stated that the start-up was covered by the 2002 FEA and the 2002 FONSI, and was not considered "regionally significant" under 40 CFR 51.853(l). *Id.*

Also in April 2005, the Center for Disease Control ("CDC"), released its Review of the U.S. Army Proposal for Off-Site Treatment and Disposal of Caustic VX Hydrolysate from the Newport Chemical Agent Disposal Facility ("2005 CDC Report"). *Id.* Doc. No. 8. The 2005 CDC Report states the following:

> CDC's review of the CVXH disposal plan examined several critical issues, including (1) potential health hazards associated with the waste produced at NECDF, (2) potential risks associated with transportation of the material from Indiana to New Jersey, (3) ability of the DuPont facility to adequately treat the CVXH in addition to the ability of NECDF to produce caustic VX hydrolysate meeting clearance criteria, and (4) potential ecologic impact associated with discharge of the DuPont-treated material into the Delaware River. Because CDC did not have the expertise to review DuPont's ecologic report, CDC requested assistance from the U.S. Environmental Protection Agency (EPA), Region II.

*Id.* at 1. The 2005 CDC Report summarized its conclusions, in relevant part, as follows:

> [W]hile the CDC found that the Army/DuPont proposal was sufficient to address critical issues in the areas of potential human toxicity, transportation, and treatment of CVXH (generated from recommended VX loading and stabilizer), EPA concluded that the information regarding the ecologic [sic] risk of treated CVXH discharge into the Delaware River was inadequate.

> Consequently, CDC cannot recommend proceeding with the treatment and disposal at the DuPont SET facility until EPA's noted deficiencies are addressed.

*Id.* at 2.  According to the 2005 CDC Report's summary, the EPA's concern was the adequacy of the risk assessment to the aquatic ecology from the discharge of treated CVXH into the Delaware River.  *Id.*  Apparently this concern stemmed, in part, from the fact "that the 20 ppb clearance criterion for VC in [] CVXH is based 'solely on the protection of humans from a drinking water source and may not be protective of aquatic organisms through ingestion or dermal exposure.'"  *Id.*

The 2005 CDC Report included as attachments certain documents upon which it relied in reaching its conclusions.  *See id.* Attachs. 2-5.  Of note, in preparing the 2005 CDC Report, the CDC relied upon the following three assessments:  (1) Review of the Toxicology and Health Hazard Considerations for Safe Management of Newport (Indiana) Caustic VX Hydrolysate, by Agency for Toxic Substances and Disease Registry in collaboration with the CDC, November 3, 2004; (2) Review of the Transportation and Risk Management Provisions for Caustic VX Hydrolysate, by the CDC in collaboration with the DOT, November 3, 2004; (3) Assessment of the Treatability of Caustic VX Hydrolysate at the DuPont Secure Environmental Treatment Facility, by Carmagen Engineering, Inc. in consultation with the CDC, November 3, 2004.  *Id.* Attach. 2-4.

Based on its review of the relevant issues, the 2005 CDC Report concluded:

> The potential human toxicity of the untreated CVXH predominantly is associated with its corrosive and caustic properties and not nerve agent effects, although low levels of VX and EA 2192 may be present in CVXH.  The transportation plan meets DOT regulations, and precautions in the plan are adequate to protect the public and personnel.  The database supports the position that CVCH produced with DIC-stabilized VX at the 8% VX agent loading level should meet the Army clearance criteria for VX and EA 2192.  Loadings greater than 8% of DIC stabilized VX or any treatment of VX stabilized with DCC is not recommended until the treatment effectiveness is demonstrated and confirmed.  Therefore, based on information provided for this review, only a portion of the Newport VX stockpile can be processed to meet clearance criteria.  The technical review of the DuPont SET indicated it is a viable process and should be capable of treating the CVXH.  EPA's

12

> ecologic analysis indicates the DuPont assessment does not contain information
> adequate to determine the ecologic risk from the discharge of treated CVXH to the
> Delaware River is acceptable.  Consequently, CDC cannot recommend proceeding
> with the treatment and disposal at the DuPont SET facility until EPA's noted
> deficiencies are addressed.

*Id.* at 14.

Also in the administrative record is a report prepared by SAIC for the Accelerated Aberdeen Chemical Agent Disposal Facility, CMA, on July 13, 2005, that evaluates the processing of Aberdeen Chemical Agent Disposal Facility ("ABCDF") mustard-agent-contaminated secondary waste by incineration at permitted commercial TSDFs.  *Id.* Doc. No. 17.  The report, entitled "Justification for Use of Commercial Incinerators for Disposition of Secondary Waste Generated at the Aberdeen Chemical Agent Disposal Facility" ("ABCDF Report"), used the EPA evaluation method to conclude that the mustard-agent secondary waste from ABCDF could occur in at least as safe a manner as in the Army's demilitarization facility incinerators at a TSDF in Sauget, Illinois, or a TSDF in Port Arthur, Texas.  *Id.* at 18.  The report did not make any conclusions with respect to VX-contaminated secondary waste, although it did mention the incinerability index for VX pursuant to EPA guidelines, citing a study dated January 3, 2003, conducted by the University of Dayton entitled, "Modeling of the Incinerability of Chemical Agents GB and VX."  *Id.* at 6-7.  In general, the ABCDF Report stated that "chemical agents are much easier to incinerate than the Class 1 organic compounds normally used to demonstrate the [destruction and removal efficiency ("DRE")]."  *Id.*

A draft of an Information Paper dated August 15, 2005, entitled, "Overview of Non-Stockpile Neutralent Treatment Technology Assessments," prepared by SAIC is also in the administrative record.  *Id.* Doc. No. 23.

13

On October 31, 2005, DuPont issued a report entitled, "The Fate of VX, EMPA, MPA, and Other Constituents in Newport Caustic Hydrolysate" ("2005 DuPont Report"), to address concerns of various government agencies and the public regarding the treatement of CVXH at DuPont's Deepwater, New Jersey, facility.  *Id.* Doc. No. 18, at 3.  DuPont used a systems approach called Layers of Protection Analysis ("LOPA"), to conclude that CVXH safely could be transported to and treated by DuPont's facility.  *Id.* at 26-27.

By letter dated February 16, 2006, the EPA notified the director of NCEH/ASTDR "that based on extensive analysis of the information provided [by] and numerous discussions with DuPont, Army CMA and CDC staff, EPA believes that all of our previously identified ecological concerns have been resolved."  *Id.* Doc. No. 22.  The letter specifically stated that

> EPA anticipates the enclos[ed detailed discussion of its concerns and the DuPont and Army responses to them,] will be incorporated as an integral part of CDC's report to Congress.  It is important to note that our evaluation of project information was premised on assurances by the CMA that the hydrolysate being shipped to DuPont will not contain detectable levels of VX and EA2192 (a toxic breakdown product that occurs during the treatment process) and will not be flammable.

*Id.* at 1.

In its July 2006 report to Congress (the "2006 CDC Report"), the CDC concluded that "all issues identified during the Phase I report have been addressed."  *Id.* Doc. No. 9, at 35.  However, the 2006 CDC Report made the following recommendations:

- NECDF should continue to collect performance data on representative sampling, and provide them to CDC for review, to maintain statistical confidence that representative hydrolysate samples are being collected consistently over time and from varying hydrolysate batches.

- Considering the potential need to re-characterize the CVXH, NECDF needs to develop an effective means to adequately sample the storage containers. CDC believes there is a need to determine what impact, if any, long-term storage will have on the material's characteristics and its conformance to the

14

clearance criteria.  In addition, DuPont will likely require new samples and analysis if storage of greater than one year occurs.

•       EPA recommends that bioassessment studies be conducted in-stream by DuPont to establish baseline in-stream benthic macroinvertebrate and fish community structure in the vicinity, including downstream of the DuPont discharge, before CVXH processing begins.

*Id.* at 35 (highlighted box text).

On April 4, 2007, the Army issued another REC ("April 2007 REC").  *Id.* Doc. No. 5.  The April 2007 REC stated, in relevant part, the following:

**Proposed Action**

The proposed action is to ship caustic waste water derived from the destruction of nerve agent VX at the Newport Chemical Agent Disposal Facility (NECDF).  This action constitutes a normal/routine movement of hazardous waste to a permitted commercial Treatment, Storage and Disposal Facility (TSDF) as recognized by the Resource Conservation and Recovery Act (RCRA).

The proposed action qualifies for CX (h) 4 as published in Appendix B of 32 CFR Part 651 (AR 200-2) *Environmental Analysis of Army Actions*: Hazardous materials/hazardous waste management and operations; Routine management, to include transportation, distribution, use, storage, medical waste, radiological and special hazards (for example, asbestos, PCBs, lead-based paint, or unexploded ordinance), and/or hazardous waste that complies with Environmental Protection Agency (EPA), Army or other agency requirements.

* * *

**Reason for Using a Record of Environmental Consideration**

The proposed action qualifies for CX (h) 4 in Appendix B of AR 200-2 (32 CFR Part 651) *Environmental Analysis of Army Actions*.  The proposed action satisfies the following screening criteria outlined in AR 200-2:

(1)  The proposed action is to ship caustic waste water derived from the destruction of nerve agent VX at NECDF to a permitted, commercial TSDF.  Originally all of the caustic waste water generated from the neutralization process was to be destroyed on site.  However, because of the terrorist attacks of September 11, 2001, and because of the continuing and immediate threat of further attacks on the United States, President Bush declared a national emergency by Proclamation 7463 on September 14, 2001.  In light of the national emergency, the Army determined that it is necessary for the

15

stockpile of VX at NECDF to be destroyed expeditiously and in a manner that does not pose a threat to public health and the environment. Action was required to reduce the time for destroying the NECDF stockpile of agent VX. Accelerated destruction of the VX stockpile at NECDF contributes to improve[d] public safety by quickly removing the risks of continued storage of VX. A decision by the Army to delay disposal of the caustic waste water in order to continue to test and evaluate an on-site disposal process would add to cost and delay completion of disposal. Operations began in May 2005 thus reducing the risk of continued agent storage. The intended action is thus being accomplished. Therefore there is no segmentation.

(2) No exceptional circumstances exist with regard to the transport of caustic waste water. While there may be some public groups opposed to this type of action, the Army considered the following in determining that there is no substantial dispute as to the size, nature or effect of the proposed action. The NECDF hydrolysate is caustic and a DOT Class 8 (corrosive) shipping hazard due to the 4 percent sodium hydroxide it contains. This is what defines it as a hazardous waste. The disposal of the NECDF hydrolysate is a routine disposal of waste similar in characteristics to sodium hydroxide. There is no difference between the transportation and subsequent disposal of this hydrolysate and sodium hydroxide. Sodium hydroxide is usually transported as a liquid. Its industrial strength is typically 50 percent. The liquid sodium hydroxide shipped into the NECDF for use in the neutralization process is in a 50 percent solution. The caustic waste water shipped from the NECDF is far less corrosive than the standard 50 percent solution commonly used by industries and routinely shipped on United States highways everyday.

According to the *National Biennial RCRA Hazardous Waste Report: Based on 2003 Data*, approximately 8.3 million tons of the 30 million tons of hazardous waste generated in the United States during 2003 is considered corrosive. The approximately 18,400 tons of caustic waste water generated at the NECDF would be less than or equal to 0.06 percent of the hazardous waste generated in the United States in 2003, and less than or equal to 0.22 percent of the total amount of corrosive hazardous waste generated that year. According to the 2002 Commodity Flow Survey released by the U.S. Census Bureau, U.S. Department of Commerce and the Bureau of Transportation Statistics, about 90 million tons of the more than 2.1 billion tons of hazardous materials transported in the United States was hazard Class 8 (corrosive). The NECDF shipment of hydrolysate will increase the shipment of hazard Class 8 (corrosive) materials in the United States by 0.02 percent.

(3) The U.S. Army routinely ships hazardous waste off site to permitted, commercial TSDFs. In the Department of Defense's Fiscal Year 2006 Annual Report to Congress, the Army reported transporting 24,000,000

16

pounds of hazardous waste to TSDFs.  Six million gallons of hydrolysate derived from the destruction of mustard agent at the Aberdeen Chemical Agent Disposal Facility was shipped off site to a commercial TSDF in more than 1300 trucks without any spills or accidents.  The waste water was shipped as routine waste.  A Record of Environmental Consideration was prepared citing CX (h) 4 in Appendix B of AR 200-2 (32 CFR Part 651) *Environmental Analysis of Army Actions*.

Initially, the Army sought to transport the NECDF hydrolysate to a Dayton, OH[,] TSDF.  This facility could not obtain the necessary permits to dispose of the waste water that were determined necessary in the NECDF 2002 EA.  There were also environmental justice concerns regarding minority and impoverished populations surrounding the Dayton, OH[,] facility.  The Army then considered transporting the NECDF hydrolysate to a Deepwater, NJ[,] facility for destruction.  Due in part to concerns from the local communities about the potential impact of the liquid effluent from the biotreatment facility into the Delaware River the CDC and the EPA prepared a report, *"Review of the U.S. Army Proposal for Off-Site Treatment and Disposal of Caustic VX [H]ydrolysate from NECDF."*  The Army began analyzing this potentially significant new information to determine if it needed to supplement the NECDF 2002 EA.  The Army's experience and environmental analysis with the destruction of VX and derived waste has been using incineration.  The proposal to use DuPont involved the use of a biotreatment facility and raised concerns regarding the Delaware River and the discharge of effluent into the estuary.  The analysis was discontinued when the Deepwater, NJ[,] facility announced it would not be able to obtain the necessary permits to accept the hydrolysate, and would therefore not participate in the proposal.

The TSDFs being considered operate a fully-permitted incinerator capable of destroying the NECDF caustic waste water and will not have to modify [their] permits in order to accept and destroy the NECDF caustic waste water.  There will not be any liquid discharge from the incineration process at the TSDFs being considered.  To date the Army's Chemical Material Agency (CMA) has safely incinerated over 2000 tons of nerve agent VX.  In addition to VX, CMA has routinely incinerated large quantities of VX decontamination solution generated from decontaminated VX contaminated buildings, structures and equipment [sic].

*Id.* at 1-4.  The April 2007 REC then referred to several umbrella NEPA documents in support of

its decision including a July 1986 Draft Programmatic Environmental Impact Statement ("July 1986

DPEIS"), a January 1988 Final Programmatic Environmental Impact Statement ("January 1988

FPEIS"), the February 26, 1988, ROD, the April 1998 draft Environmental Impact Statement for

17

NECDF ("1998 DEIS"), the December 1998 FEIS, and the February 1999 ROD.  *Id.* at 5.  In

addition, the April 2007 REC stated:

> In July 2002, the Army published an environmental assessment titled *"Accelerated Neutralization of Chemical Agent and Off Site Shipment of Liquid Process Effluents at the Newport Chemical Agent Disposal Facility"*.  This document was prepared to supplement the final FEIS.  It considered in detail the potential environmental consequences of advances in accelerating the neutralization process and in the secondary treatment and/or transport and off site disposal of the caustic waste water/hydrolysate.  A Finding of No Significant Impact was issued in October 2002.

*Id.* at 5-6.  The April 2007 REC also cited the RCRA permit at NECD, the July 2006 CDC Report

on the Army's proposal for off-site treatment of CVXH, the DuPont 2004 Assessment, and the NRC

study.  *Id.* at 6.

The April 2007 REC concluded:

> I have determined in accordance with Army Regulation 200-2, Environmental Effects of Army Actions, and Title 40 Code of Federal Regulations, Part 1502.9(c), the Army's plan to ship caustic waste water from the facility at Newport to a TSDF, will create no significant environmental impacts.  There is no new information or circumstances that would require supplementation of previous NEPA documents.

*Id.* at 6.  The April 2007 REC was signed by Jeffery Brubaker ("Brubaker"), Site Project Manager,

NECDF, and Lieutenant Colonel, Brian M. Lynch ("LTC Lynch"), Commander, NECD.  *Id.*

Brubaker testified at the hearing on this motion that he reviewed and approved the April

2007 REC, however, other government staff prepared the document.  Hr'g Tr. at 102.

On April 9, 2007, LTC Lynch sent a letter (the "NECDF 2007 letter") in response to a

December 12, 2006, letter from IDEM concerning the transportation of CVXH from NECDF.

Admin. R. Doc. No. 6.  The NECDF 2007 letter, and its attachments, incorporated information

provided to both IDEM and the Indiana Department of Homeland Security ("IDHS"), over the prior

several months.  *Id.*  "In addition, a Transport Safety Plan, April 4, 2007, for the possibility of off-

site hydrolysate transport ha[d] been prepared to fulfill the requirements of [Indiana Code §] 13-22-

18

7.5 and [that] plan [was] also attached." *Id.*, Attach. 2, Apr. 4, 2007, Trans. Safety Plan & Risk Eval. for Shipment of NECDF Caustic Hydrolysate.[7]  The main attachment to the NECDF 2007 letter was a memorandum of sorts addressed to LTC Lynch that spoke to IDEM's transportation concerns, including the pertinent properties of CVXH.  *Id.*, Attach. 1.

There are two e-mail messages in the administrative record dated April 17, 2007, that purport to reflect the amount of waste shipped from Indiana to Texas for certain years during the period between 1991 and 2005.  *Id.* Doc. Nos. 29 & 30.

Also in the administrative record and, apparently, generated from IDEM's website on April 20, 2007, is IDEM's Permit Guide for generating hazardous waste and shipping it off site.  *Id.* Doc. No. 28.

On May 18, 2007,[8] the CMA published its "Transport Safety Plan and Risk Evaluation for Shipment of NECDF Caustic Hydrolysate" ("Army TSP").  *Id.* Doc. No. 39.  It is the first time the Army disclosed, in the public portion of the administrative record, that it planned to ship CVXH from NECDF to Veolia's facility in Port Arthur, Texas.  *Id.* at 1.  The plan specifically stated that "[p]rocedures and information in this plan demonstrate NECDF's compliance with Indiana Code [§] 13-22-7.5, Transportation of Chemical Munitions, which applies to the shipment of Newport caustic hydrolysate (NCH) to an off-site commercial treatment, storage, disposal facility (TSDF)." *Id.*  The TSP recommended a single route from Newport, Indiana, to Port Arthur, Texas.  *Id.* at 8.

---

[7]The Court notes that the attachments to the April 2007 letter specifically state that data contained in the documents "shall not be disclosed, used or duplicated in-whole or in-part for any purpose."  Admin. R. Doc. No. 6, Attachs. at footer (stating "[t]his document contains information that is EXEMPT FROM MANDATORY DISCLOSURE under the Freedom of Information Act (FOIA).  Exemption 4 applies.  (5 U.S.C. 552)").

[8]The Court notes that the instant law suit was filed on May 8, 2007, seeking injunctive relief.

It specifically identified the dangers to land, air and water if an accident were to occur during transit. *Id.* at 7-9.  It also assessed the risks associated with, and ways to prevent, a minor leak from valve assemblies on the containers used for transport.  *Id.* at 11.  The Army TSP also included a Material Safety Data Sheet ("MSDS") for CVXH.  *Id.* App. B.  The MSDS reported that "[t]esting established that this hydrolysate was <u>not</u> a Department of Transportation (DOT) Class 6.1 (Poison) toxic per 49 CFR but is was corrosive and capable of destroying skin and producing tissue injury." *Id.*  The MSDS also disclosed the "non-detect" limits for VX and EA2192 in CVXH.  *Id.*

On June 8, 2007, Veolia submitted its own TSP (the "Veolia TSP").  *Id.* Doc. No. 40.  The Veolia TSP stated that it "was written to comply with Indiana Code [§] 13-22-7.5, and all applicable USDOT requirements."  *Id.* at 4.  The plan accounted for environmental contamination risks associated with an accident or a leak.  *Id.* 9-15.

On June 18, 2007, the Army issued another REC ("June 2007 REC").  *Id.* Doc. No. 42.  The June 2007 REC purported to address the issues raised by a letter dated April 18, 2007 ("Plaintiffs' April 2007 letter"), sent to the NECD commander, and IDEM, from Mr. Mick Harrison, Esq., who represents Plaintiffs in this suit.  *Id.* at 2.  In short, the Plaintiffs' April 2007 letter raised questions about information Plaintiffs had learned about detection of VX and/or EA2192 in CVXH at NECDF at concentrations higher than the method detection limits referenced in all of the Army's prior release data.  *Id.*  The Plaintiffs' April 2007 letter requested that the Army stop further shipments of CVXH until the allegedly new risks of harm to human health and the environment could be properly evaluated.  *Id.*

The June 2007 REC specifically addressed the concerns raised in the Plaintiffs' April 2007 letter as follows:

. . . IDEM has regulatory oversight of the U.S. Army's activities at NECD. . . . IDEM responded to Mr. Harrison's letter on April 20, 2007[,] that hydrolysate has been properly characterized at the point of generation, as is required. Each batch of hydrolysate for which IDEM has conducted analytical review has been verified as non-detect for VX, using acceptable methodologies and meets all applicable state and federal requirements. Furthermore, hydrolysate contains an excess of sodium hydroxide, as a conservative safeguard[,] to destroy any trace amounts of VX that might be present in either the aqueous or organic layers of hydrolysate during storage.

On April 24, 2007[,] the U.S. Army Chemical Materials Agency (CMA) sent the Science Application International Corporation Program Manager supporting the US [sic] Army CMA to NECDF to review the sampling records and data of ISO containers used for storage and [to] inquire into the allegations that VX and EA2192 had been detected in hydrolysate. From the outset, it should be noted that all batches of hydrolysate from the reactors must clear the requirements for non-detect for VX and EA2192 at less than the MDL which must be less than 20 ppb or 1 ppm, respectively. Hydrolysate that does not meet these criteria is sent back to the reactor for further processing, resampling, and reanalysis for clearance prior to storage. No batch of hydrolysate has been sent to storage without the sample analysis meeting these clearance criteria. Review of sampling records did not identify any post-clearance data at or above 50 ppb VX in hydrolysate.

In addition, the Government NECDF Field Office staff reviewed all of the records of sampling for any spills and leaking containers. Out of a total of 202 containers, there have only been nine that had leaks. In fact, these were not actual leaks, but instead the containers involved had seepage from the valve area. Eight of those containers were drained and the contents transferred to another container. For the final occurrence, the valve was fixed. Several different ISO container suppliers have been used at NECDF, but none of the seepages were attributable to Eurotainers; NECDF has switched to the use of that vendor as the sole source supplier for all future ISO containers to be filled.

There were only two readings in the records for material that was not rejected and reprocessed. Only two readings above the VX and EA2192 MDL were determined to exist in the records: (1) the first was for VX in rinsate collected after a spill of material in the loading arm, and (2) the second was for EA2192 in liquid collected from a seeping ISO container valve.

In the first case, the spill material was cleaned up per established procedures with the final rinse sample collected. Analysis of this sample showed a VX concentrate of 27 ppb. However, there was no ethyl methylphosphonic acid (EMPA) or methylphosphonic acid (MPA) detected in the sample. This result is not consistent with VX in hydrolysate because, for VX to really be present, EMPA and MPA would also have to be present. There is no explanation for the presence of VX in the

absence of these higher concentration byproducts of VX destruction (i.e. EMPA and MPA). So, the VX response observed must be an interferent. The gas chromatograph-flame photometric detection method used for waste screening is sensitive to VX but is not specific to this compound and therefore provides a worst-case analysis. The detector will respond to other substances containing phosphorous that elute from the gas chromatograph at the VX retention time. If VX is present it will be detected. However, due to the non-selective nature of the instrument, interferences with this method are possible. If interferences are present they will cause an apparent VX instrument response, which was the likely cause with this reading. It should be noted that analysis of VX in hydrolysate for clearance to ISO container storage is accomplished using a more VX-specific analytical technique involving a gas chromatograph-ion trap mass spectrometer.

For the second case involving the seepage from the ISO container valve, the results in the record indicate an analytical impossibility of a high EA2192 reading with very low EMPA, MPA and N,N-diisopropylaminoethane thiol (thiolamine). These characteristics of the material in the record indicate that the material analyzed was not hydrolysate. Subsequent analysis of the hydrolysate sampled from the ISO containers storing the hyrdrolysate that spilled in the loading arm and the hydrolysate from the seeping ISO container demonstrated non-detect for VX and EA2192. In reviewing all the data, there have been no readings of VX or EA2192 exceeding the clearance criteria with regard to any hydrolysate stored in the ISO containers, much less any certified for shipment.

To validate previously generated data which confirms no hydrolysate has been transferred to ISO containers that does not meet the non-detect clearance criteria, six ISO containers were sampled and analyzed for VX and EA2192 the week of May 28, 2007. The Project Manager for Chemical Stockpile Elimination identified three ISO containers to be sampled: (1) The oldest stored container in the Hydrolysate Intermodal Container Storage Yard (HICSY), generated in February 2006 ([h]ydrolysate produced prior to Feb 06 [sic] is stored inside the Chemical Limited Area of the NECDF); (2) The ISO container that now contains the hydrolysate from the ISO container that was involved in the loading arm incident in May 2006; and (3) The ISO container that now contains the hydrolysate that was transferred from the leaking valve generated in July 2006. To validate that a random set of ISO containers would also yield similar results, IDEM, Mr. Tom Linson, was asked to select three ISO containers for sampling. Mr. Linson asked that two containers greater than a year old be sampled and one container that was six months old be sampled. Using these criteria, ISO containers generated in March, April and December 2006 were selected for sampling. A procedure for sampling the ISO containers using a Composite Liquid Waste Sampler (COLIWASA) tube was developed and validated. All six ISO containers were sampled and tested for VX and EA2192 and all were non-detect for these compounds thereby validating the previous clearance records. These data substantiate the fact that in excess caustic[,] VX can not and does not form in the ISO containers over time. These findings are

also supported, as previously documented, by the National Research Council and program office files.

The possibility of theft of hydrolysate and subsequent reformation of VX was not considered previously, because this scenario is too remote. The [CWC] and implementing regulations address this possibility by limiting the amount of precursor chemicals that can be transported. The CWC contains restrictions for the export or import of certain scheduled chemicals. These are referred to as schedule 2 chemicals. These requirements have been implemented in the Export Administration Regulations (EAR) and the CWC Regulations. Certain mixtures are also controlled, in part, to prevent such mixtures from being used as a precursor to the formulation of prohibited agent. EMPA, MPA, and thiolamine are CWC treat-defined schedule 2 compounds that may be found in hydrolysate. It is conceivable that these compounds, if extracted from hydrolysate, could be used to produce agent. This is not a reversal of the destruction process. It would take a chemical manufacturing process to accomplish agent production from these chemicals. This would be a very impractical way to produce agent. To preclude this possibility, the CWC observers track these hydrolysate schedule [2] compounds through the transportation and destruction process. The EAR exempts mixtures containing schedule 2 chemicals if the concentration of each schedule 2 chemical in a mixture is 30 percent or less by weight. As described in the [MSDS], the hydrolysate contains concentrations less than 30 percent by weight of EMPA, MPA and thiolamine. Accordingly, even if hydrolysate were to fall into the hands of terrorists, there is not a sufficient quantity of waste that could be converted into VX.

*Id.* at 2-5.

The June 2007 REC used the same rationale as the April 2007 REC for not performing an EIS or EA. *Id.* at 5-6. Specifically, the Army cited the classification of CVXH as a hazardous waste and its own screening criteria for manufacture and transportation of such wastes. *Id.* at 5 (citing "CX (h) 4 in Appendix B of 32 CFR Part 651 (AR 200-2)"). The June 2007 REC also cited to several studies in which "[t]he Army ha[d] determined . . . that the VX will not reform, and [it] maintains the wastewater in a reactive matrix consisting of 4% sodium hydroxide that would destroy any VX . . . ." *Id.* at 6 (citations to reports omitted).

The administrative record also contains three undated documents generated by the CMA. *Id.* Doc. Nos. 10-12. The first document is entitled "Newport Chemical Agent Disposal Facility:

23

*Caustic hydrolysate (caustic wastewater) facts*," (the "CMA CVXH facts document"). *Id.* Doc. No. 10. This document explained the characteristics of the CVXH produced at NECDF, and the toxicity of the combined compounds ("EA-22192, [sic] EMPA, MPA and thiolamine"). *Id.* With respect to toxicity, the document stated:

> The dermal and oral toxicity of caustic wastewater was evaluated in February 1999. This testing established that hydrolysate qualified as a corrosive capable of damaging skin and producing gastrointestinal injury, as would be expected from similar caustic solutions. Splash protection and respiratory protection from caustic vapors is needed when handling hydrolysate.

*Id.* The CMA CVXH facts document stated that "[t]he Army is exploring all possibilities for hydrolysate treatment, including on- and off-site options." *Id.*

The second document is entitled "Analyzing caustic hydrolysate," ("CMA Analyzing CVXH document"). *Id.* Doc. No. 11. This document described how chemical neutralization at NECDF works, explained the method detection limit criteria for removal of CVXH from NECDF, and explained the Army's methodology for setting the method detection limit criteria. *Id.* The CMA Analyzing CVXH document concluded:

> The analytical instruments used at NECDF are capable of detecting VX in liquid wastewater far below the 80 ppb [U.S. Army Center for Health Promotion and Prevention Medicine limit] determined to be safe. In the case of detecting for VX in the hydrolysate, the extremely sensitive instruments can detect if agent is or is not present above the MDL of 20 ppb. After achieving a non-detect for agent, the destruction process is complete.

*Id.*

The third undated document is entitled "Hydrolysate Transportation Facts, *U.S. Army Chemical Materials Agency (CMA) and Hydrolysate*," (the "CMA CVXH Transportation Facts sheet"). *Id.* Doc. No. 12. The CMA CVXH Transportation Facts sheet stated that the corrosive nature of the CVXH did not represent a new and unusual transportation risk. *Id.* The information

24

sheet specifically compared shipment of CVXH to that of sodium hydroxide and provided data about

the Army's proposed transportation of CVXH from NECDF to DuPont's facility in New Jersey.  *Id.*

In addition, the CMA CVXH Transportation Facts sheet cited the 2005 CDC Report, which stated

that "[t]he Army's proposed transportation plan meets DOT regulations," and that "[p]recautions

in the plan are adequate to protect the public, workers and the environment."  *Id.*  The information

sheet concluded:

> [T]he safety standards and records of hazardous materials shipping demonstrates that
> the Army's proposal to ship caustic wastewater from Indiana to New Jersey is
> reasonable as well as scientifically sound.
>
> CMA is committed to the safe off-site shipment and treatment of the caustic
> wastewater from the Newport site.  Off-site shipment is legal, safe, cost-effective and
> efficient.  It meets the existing treaty, federal and state laws [sic] and regulations.

*Id.*


## B.  FURTHER BACKGROUND INFORMATION ABOUT THE NEUTRALIZATION PROCESS AT NECDF

Although this information may be contained in various documents in the administrative

record, the following is a summary of the neutralization process that occurs at NECDF.  The

neutralization process of VX requires transfer of the one-ton containers from NECD to NECDF.

Lyle Decl. ¶ 6.  Once at NECDF, the VX is transferred from the one-ton containers to holding tanks.

*Id.*

From the holding tanks, the VX is injected into a 1,000-gallon reactor that contains a mixture

of sodium hydroxide ("NaOH") and water; the mixture has been heated to approximately 194 °F.

*Id.*  The VX and the NaOH mixture is agitated for at least 150 minutes.  *Id.*  During this process, the

VX reacts with the hot NaOH and is destroyed.  *Id.*  The resulting product is the solution called

caustic VX hydrolysate or CVXH, which consists of water (70-85%), phosphorus and sulfur-containing organic salts (11-26%) and NaOH (4%). *Id.* ¶ 7. The remaining concentration of NaOH ranges from 3-5%, and is necessary, according to the Government experts, to establish the conditions necessary to prevent VX from forming in CVXH over time. Kavanagh Decl. ¶ 8.

Before CVXH leaves the reactor building, an on-site lab analyzes the material to confirm the destruction of the VX. Kavanagh Decl. ¶ 9. The lab analysis must confirm that the following "clearance criteria" are met:

(1) the CVXH is non-detect for VX, with a method detection limit of less than 20 ppb originally, but now a 9.3 ppb limit;

(2) the CVXH is non-detect for EA2192, a byproduct of the VX hydrolysis process, with a method detection limit less than or equal to 1 part per million ("ppm") originally, but now a 200 ppb limit; and

(3) the CVXH must have a flash point equal to or greater than 140 °F to ensure that it is not flammable.

*Id.* ¶ 10; Hr'g Tr. at 50 & 62. If any of the above criteria are not met, that batch of CVXH is returned to the reactor to repeat the neutralization process until it passes all three tests. Kavanagh Decl. ¶ 10.

Dr. William Gerard Kavanagh[9] ("Dr. Kavanagh"), one of the Government's experts, opined that the instruments used at NECDF to analyze CVXH are capable of detecting the relevant compounds at extremely low levels using standard analytical chemistry techniques. *Id.* ¶ 9.

---

[9]Dr. Kavanagh has a B.S. in chemistry from Providence College, a master's degree in chemistry, with a focus on organic chemistry, from Niagra University, and a Ph.D. in chemistry, biochemistry from Kent State University. Hr'g Tr. at 571. Since 1970 Dr. Kavanagh has been involved in the Government's nerve agent program as an analytical scientist. *Id.* at 571-72. Today he considers himself "a senior analytical chemist with expertise in the methods that have been applied to include [sic] lipacoma chromatography, gas chromatography, mass spectroscopy, claim photonitric defection and associated methods for [certain] an[a]lytes . . . ." *Id.* at 572.

Moreover, Dr. Kavanagh opines that the Army's analytical chemistry quality controls demonstrate that the instruments, methods and analysts are performing as defined in the Standard Operating Procedures ("SOP").  *Id.* ¶¶ 17-22.  According to Dr. Kavanagh, the measurement techniques used at NECDF to "clear" the CVXH are reliable and accurate.  *Id.* ¶¶ 17, 20.

There is disagreement, however, among the experts on the reliability of the analytical method.  At the hearing, Dr. Robert L. Irvine ("Dr. Irvine"), testified on behalf of both Plaintiffs and Defendants; he has a bachelor's degree in chemical engineering and a masters degree in environmental engineering from Tufts University, and a Ph.D. in chemical engineering from Rice University.  Hr'g Tr. at 470-533.  Dr. Irvine is a retired emeritus professor from the University of Notre Dame and he is the chief scientist for Parsons at NECDF.  *Id.* at 471.  In his role at NECDF, Dr. Irvine evaluates and comments upon technical issues that arise at the facility.  *Id.* at 471-72.  Dr. Irvine has reviewed the analytical data for all cleared batches of CVXH produced at NECDF and recalled seeing concentration values for VX in the range of 4 ppb up to and including 13.9 ppb.  *Id.* at 473-74.

In January or February 2007, Dr. Irvine and his staff prepared a report for Parsons entitled "Review of the Modified Method for Analysis of VX and Hydrolysate" ("Irvine report"), which was finalized on April 10, 2007.  *Id.* at 477-78.  *See also* Pl.'s Hr'g Ex. 13.  Dr. Irvine testified that at the time he and his staff published the Irvine report it reflected the scientific opinion and consensus of he and his staff.  Hr'g Tr. at 480.  The report opines that the "modified method" the Army sought to introduce into the analytical lab for testing CVXH for VX and EA2192 was not appropriate for NECDF.  Pls.' Hr'g Ex. 13, at 1 & Table ES-1, at 3.  After eleven months of testing the modified method, Dr. Irvine thought the modified method had the following critical problems: "the modified method . . . failed to perform accurately within the [CVXH] matrix, as evidenced by low spike

27

recoveries . . . [a]s such, the modified method shows an increased potential for underestimated VX levels and false negatives but no potential for reduction in false positives attributed to the current method;" "the modified method . . . demonstrated poor precision compared to the current method . . .[that] could result in [a CVXH] VX concentration limit of 3 ppb as per the [CDC's] recommendation that any new method have a decision point [or MDL] established at such a level such that there is a 95+% confidence that a sample reading less than this decision point contains less than 20 ppb;" the modified method procedures were flawed, which could lead to errors in MDL determinations and ultimately add time to the analytical process; the modified method would also further remove the quality assurance ("QA") criteria away from EPA standards, and sharply lower the MDL necessary to meet the CDC's recommendation that there be a 95% confidence that the VX concentration in CVXH is less than 20 ppb if its measured concentration of VX is less than the MDL. *Id.* at 1-3. *See also* Hr'g Tr. at 482-502, Irvine-Direct (discussing the content of the Irvine report).

Nevertheless, Dr. Irvine testified at the hearing that the issues raised in his report were addressed to his satisfaction in the sense that the CDC had reviewed the data he had and had reviewed his report but concluded that the modified method, or the method of standard additions, was an appropriate method. Hr'g Tr. at 524.

Dr. Michael Anthony Sommer, II[10] ("Dr. Sommer"), an environmental, analytical and forensic chemist, testified at the hearing that the modified method, or the method of standard additions, would not be a valid and reliable indication of the true concentration of VX in CVXH.

---

[10]Dr. Sommer has bachelor of science, a master's, and a Ph.D. in analytical geochemistry. Hr'g Tr. at 314.  Since he obtained his Ph.D., Dr. Sommer has developed mass spectrometric and gas chromatographic techniques.  *Id.* at 314-15.  He has testified as an expert on the test methodologies used by the EPA in environmental exposure cases.  *Id.* at 315-16.

*Id.* at 323.  It is Dr. Sommer's opinion that because the methods used by the Army to test for VX in CVXH are not EPA methods, they are "thoroughly not appropriate for this kind of determination."  *Id.* at 332-33.  In making his assessment of the tests used by NECDF to clear CVXH, Dr. Sommer testified that he "reviewed the analytical data, and the definition of the test methods that were utilized for documents that preceded the [Irvine report]."  *Id.* at 334.  In addition, in forming his opinion about the analytical methods at NECDF, Dr. Sommer reviewed documents that specified how the analytical methods operate and the quality assurance and quality controls for each method used at NECDF.  *Id.* at 334-35.

Colonel Jesse L. Barber ("Colonel Barber"), Project Manager for the Government's chemical stockpile elimination program, testified at the hearing that he made the decision to move to the modified method after consultation with the CDC, his scientific staff and the support staff at NECDF.  *Id.* at 87-88; 97-98.  Colonel Barber testified that the CDC recommended that NECDF implement the modified method.  *Id.* at 88.  In doing so, the CDC had reviewed all of the data collected by NECDF using the new method over a four-phase process.  *Id.* at 86-88.  Colonel Barber testified that Dr. Irvine participated in the final meeting regarding whether or not NECDF would switch to the modified method and Colonel Barber stated that it was his opinion that Dr. Irvine's concerns had been appropriately addressed by the end of the meeting.  *Id.* at 97-98.

CVXH in its "cleared" form is classified for purposes of RCRA as a "corrosive hazardous waste."  O'Donnell Decl. ¶ 5.  Transport of such waste is regulated by the U.S. DOT, IDEM, and EPA through RCRA.  *Id.*  The shipment manifests for CVXH identify it as derived from the treatment of VX (I001) and as a corrosive waste (D002).  *Id.*  The material is "corrosive" because it contains approximately 4% NaOH and has a pH greater than 13.  *Id.* ¶ 4.  CVXH gives off a strong odor because of the thiolamine content, Kavanagh Decl. ¶ 8, however, the health risks associated

29

with it are directly related to its caustic and corrosive characteristics, not to its odor or any airborne effect.  Kerger Decl. ¶ 8.

Once CVXH has been "cleared," it is placed in special intermodal containers, known as ISOs, which are approved by the DOT.  Kavanagh Decl. ¶ 11.  An ISO is a reinforced stainless-steel storage vessel mounted inside a protective steel frame, with a liquid capacity of approximately 4,000 gallons.  *Id.*

Operation of NECDF is monitored by the Army, the CDC, and other federal, state and local agencies.  Lyle Decl. ¶¶ 10, 11.

## C.  SCIENTIFIC STUDIES REGARDING
## FORMATION OR REFORMATION OF VX IN CVXH

In a study apparently performed "some time ago," Hr'g Tr. at 503, Irvine-Direct, (the "Brickhouse study"), scientists reported that "[i]n the presence of EMPA and 2-diisoproylaminoethanethiol (VX thiol), [dicyclohexylcarbodiimide, or] DCC[,] promotes the formation of VX under ambient conditions."  Pls.' Hr'g Ex. 10, at 617.  DCC is a stabilizer for VX and had, at the time, "been observed to survive intact in the organic layer formed during the caustic hydrolysis of stabilized VX."  *Id.*

In addition, on June 3, 2004, the CMA issued a report entitled, "Reformation of VX in Hydrolysate, Preliminary Report" ("CMA VX-reformation report"), in which the CMA concluded:

> While considered theoretically possible, VX <u>does not reform</u> in 8 or 16% DIC Hydrolysate maintained under [certain conditions].
>
> It is suggested that VX reformation does not occur, under the conditions of reduced pH and increased organic layer, due to the excessive amount of activation energy required.  It is also possible that the amount of VX present under equilibrium test conditions was so small that the changes in the equilibrium conditions that caused reformation resulted in an increase in VX that is too small to be measured.

30

Pls.' Exh. 9, at 6.  *See also id.* at 16 (concluding, in part, that "[a]dditional organic layer . . . is not associated with VX reformation").  However, in Table 8, the CMA scientists reported that in the organic layer alone, at certain certain pH and DCC stabilizer levels, test results indicated the concentration of VX to be greater than 600 ppb.  *Id.* at 16.

At the hearing, Dr. Sommer testified that, based on his review of the Brickhouse study, the 2000 NRC study, a June 7, 2004, Trip Report prepared by a CDC environmental engineer and an industrial hygienest, and the CMA VX-reformation report, it is possible that VX will form or reform in CVXH under some conditions.  Hr'g Tr. at 320-21, 330-31, 336-45; Pls.' Hr'g Ex. 4, Pls.' Hr'g Ex. 9.

Also at the hearing, Dr. Irvine testified that the Brickhouse study tested whether MPA, VX-thiol and DCC in a matrix would form VX.  Hr'g Tr. at 506 (testifying about the discussion in the Brickhouse study at page 618).  The Brickhouse study showed that initially VX would not form, however, after addition of a sodium compound to raise the pH to 14, the researchers observed VX formation.  *Id.*  Dr. Irvine also testified that the reactive chemicals in the Brickhouse study were in an organic solvent, whereas the reactive chemicals in CVXH are in caustic water or in separate organic phases that are different from the organic solvent in the Brickhouse study.  *Id.* at 523.  Dr. Irvine testified that he "learn[ed] a lot from this study," regarding "how the stabilizer either works or is supposed to work," "[b]ut there are marked differences between reality . . . and what's in [the Brickhouse study]."  *Id.  See also id.* at 529.

Dr. Irvine also testified about the CMA VX-reformation report.  *Id.* at 507-14, 18-22.  Dr. Irvine testified that he had some role in production of that report.  *Id.* at 507.  With respect to the data contained in Table 8, Dr. Irvine testified that he questioned the validity of the results because of the spike recovery rates listed in the table.  *Id.* at 508.  Dr. Irvine testified that the "report clearly

demonstrates that there's no expected reformation in hydrolysate under normal conditions. . . . For normal hydrolysate conditions, which is reported in the previous [fifteen] pages, there's no obvious reformation of VX at all." *Id.* at 518-19.

Dr. Kavanagh testified about the Brickhouse report at length. *Id.* at 585-91. In essence, Dr. Kavanagh opined that the Brickhouse results were expected because you put the reactive chemicals in an organic solvent. *Id.* at 586-87. However, VX will not form in a water matrix such as CVXH because the intermediate chemical necessary for formation of VX, pyrophosphate "doesn't exist in the presence of water." *Id.* at 590.

## D.  PRODUCTION INCIDENTS AT NECDF

As referenced in the June 2007 REC, there were several incidents at NECDF that caused Plaintiffs to become concerned about the proper characterization of CVXH, the transportation thereof to Port Arthur, and the subsequent incineration of CVXH at Veolia: (1) the detection of EA2192, at a concentration of 500 ppb or, possibly, as high as 1ppm, in liquid collected from a leaking valve of an ISO container storing CVXH; and (2) the detection of VX, at a concentration of 27 ppb, in rinsate collected after a spill of material from a loading arm in the processing area. Admin. R. Doc. No. 42, at 3.

With respect to the detection of EA2192 at a concentration of 500 ppb or, possibly, as high as 1ppm, the material tested had been obtained from a plastic bag that had been used to cover a leaking valve of an ISO. Hr'g Tr. at 581-82, Kavanagh-Direct. The lab at NECDF tested the liquid that had been collected for the five major constituents that are looked for in each waste clean up sample. Hr'g Tr. at 174, Brubaker-Cross. NECDF Site Project Manager Brubaker recalled that EA2192 was detected, however, the EMPA, MPA and thiolamine concentrations were not in

proportion to that of the EA2192 that they should have been had the material tested been CVXH. *Id.* Dr. Kavanagh testified that two analysis were done on the sample, the first showed an EA2192 concentration of 500 ppb, the second showed a reading of 1 ppm. *Id.* at 582, Kavanagh-Direct. Because the two analytical results were so different, Kavanagh suspected some analytical error. *Id.* In addition, as testified to by Brubaker, if there were actually that much EA2192 in the sample, there would also be higher concentrations of EMPA, MPA and thiolamine, but there were not. *Id.* The CVXH that had been stored in the leaking ISO had been transferred to another ISO. *Id.* at 582-83. NECDF tested the CVXH in that second ISO to be sure that the constituents had not changed since the batch had been cleared. *Id.* That CVXH was found to be non-detect for EA2192. *Id.* at 583.

With respect to the detection of VX at a concentration of 27 ppb, Brubaker testified that a spill occurred from the loading arm prior to loading cleared CVXH into an ISO. *Id.* at 116-17, Brubaker-Direct. The high concentration result was obtained after the clean up procedure had been followed. *Id.* at 117. Brubaker testified that the conclusion was that the 27 ppb VX reading was a false positive from an interferent. *Id.* at 119-20. Similarly, Dr. Kavanagh testified that with a VX reading of 27 ppb, a scientist would expect to find proportionate quantities of EA2192, EMPA, MPA and thiolamine. *Id.* at 578, Kavanagh-Direct. However, the test results showed none of those constituents present. *Id.* The ISO container involved in this incident was also re-checked and found to be non-detect for VX and EA2192. *Id.* at 578-79.

Another problem that prompted Plaintiffs' concern regarding the proper characterization of CVXH was the report that CVXH had been transferred prematurely from the reactor area to a holding tank usually reserved for cleared CVXH. Hr'g Tr. at 64-66, Barber-Direct. Colonel Barber testified that this had occurred three times. *Id.* at 64-65. Brubaker testified that he recalled this problem occurring twice. *Id.* at 109, Brubaker-Direct. Brubaker considered the problem an operator

error and an accident rather than an intentional act.  *Id.*  Brubaker recalled that those two batches

tested high for either VX or EA2192 and were reprocessed and eventually cleared.  *Id.* at 109-10.

The SOP was changed to prevent this type of problem in the future; specifically, a quality assurance

("QA") stamp on the data package is required before CVXH can be transferred to a holding tank

prior to storage in an ISO.  *Id.* at 613-14, Kavanah-Cross.

Visual inspection of stored CVXH in ISOs has revealed ten leaks over the last two years.

*Id.* at 167, Brubaker-Direct.  When a leak is found, NECDF employees follow a clean up procedure,

then makes an assessment of whether or not the leak can be repaired or if the material in the ISO

needs to be transferred to another container.  *Id.*  NECDF has used several ISO container suppliers,

however, one supplier's ISOs, Eurotainer, have never leaked.  *Id.* at 167-68.  NECDF uses only

Eurotainers to ship CVXH from Newport to Veolia in Port Arthur, Texas.  *Id.* at 168.

Brubaker also testified regarding a test result that had shown a VX concentration of 19 ppm

in the solids.  *Id.* at 170, Brubaker-Direct.  *See also* Pls.' Hr'g Ex. 3.  Brubaker testified that the

material had been collected during a maintenance activity at NECDF.  Hr'g Tr. at 171.  Brubaker

stated that no solids are shipped from NECDF to Veolia.  *Id.*

Finally, Colonel Barber testified that the first twenty-four batches of CVXH produced at

NECDF were flammable.  *Id.* at 83, Barber-Direct.  At that point in time there was no clearance

criteria for flammability because all of the earlier testing data had shown that CVXH was not

flammable.  *Id.*  When NECDF discovered this problem, the operation was paused to address it.  *Id.*

It was explained at the hearing that the hydrolysis process creates volatile organic compounds that

caused the initial batches of CVXH to test as flammable materials.  *Id.* at 83-84, 140-41.  Because

the Government had said it would not ship CVXH that was flammable, it added a step to the

hydrolysis process during which the volatile materials are vented through NECDF's existing carbon

filter bank in its gas emissions stack.  Hr'g Tr. at 84-85, 98.  The venting process has caused NECDF

to change out the carbon filters more frequently than originally intended.  *Id.* at 100.  But, it has not

caused NECDF to exceed its CAA permit levels of VOC emissions.  *Id.* at 221, Rowden-Direct.


### E.  INCINERATION AT THE VEOLIA FACILITY IN PORT ARTHUR, TEXAS

Veolia's Port Arthur, Texas, incinerator was re-permitted under the Clean Air Act ("CAA")

and RCRA by the Texas Commission on Environmental Quality ("TCEQ") and the U.S. EPA, in

August 2004.  Magee Decl. ¶ 10.  This process accounted for the fact that certain uncharacterized

constituents exist in all combustion emissions at trace concentrations too low to measure.  *Id.* ¶ 29.

The facility was designed to treat, store, and dispose of solid, semi-solid and liquid hazardous and

PCB wastes.  *Id.* ¶ 10.

According to Veolia's expert, Dr. Richard S. Magee[11] ("Dr. Magee"), the facility was

required to, and did, demonstrate compliance with Maximum Achievable Control Technology

("MACT") standards developed by the EPA for the hazardous waste industry.  *Id.* ¶ 11.  MACT

standards require incinerator owner/operators to meet emission limits, install emission control

technologies, monitor emissions and operating parameters, and follow specified work practices.  *Id.*

In addition, TCEQ undertook a site-specific health risk assessment for the Veolia facility prior to

renewing its permit in 2004.  *Id.*  This assessment ensured that emissions from the Veolia facility

---

[11]Dr. Magee has bachelor of science, master's, and Sc.D. degrees from Stevens Institute
of Technology, in engineering with an emphasis in mechanical engineering.  Magee Decl.,
Attach. 1.  Currently, he is a research professor in the Center for Environmental Systems at
Stevens Institute of Technology.  *Id.*  Dr. Magee also serves as technical director for the New
Jersey Corporation for Advanced Technology, a not-for-profit public/private partnership
designed to develop, verify and commercialize emerging, innovative environmental and energy
technologies.  *Id.*

would not pose a danger to human health or the environment in the Port Arthur or the greater Jefferson County area. *Id.*

Although a more detailed diagram of the Veolia incinerator was introduced into evidence at the hearing in this matter, *see* Def.'s Hr'g Ex. M, the following diagram gives an overview of the incineration process at Veolia:



Veolia's Corrected Opp'n Br., at 24.

Once CVXH arrives at the Veolia facility, it is pumped into a storage tank, and from there, into two smaller carbon steel tanks for holding immediately prior to incineration. Magee Decl. ¶ 16. The CVXH is mixed with a proprietary water/reagent slurry prior to treatment in the incinerator and the pH of the hydrolysate-water/reagent mixture is checked. *Id.* To date, in all cases, the pH has remained above 12.5. *Id.* This mixture is then pumped into the incinerator. *Id.* Veolia operates the incinerator at a temperature of approximately 2,000 °F. *Id.* ¶ 19.

Because VX and CVXH have low thermal stability, or a low ability to resist chemical bond cleavage and decomposition upon exposure to elevated temperatures, it is easily destructed in an incinerator. *Id.* ¶ 17. Materials that resist such destruction, materials such as 1,2-dichlorobenzene, are rated "Class 1" organic materials. *Id.* Materials like VX and CVXH are Class 5 organic materials because they are much more readily destroyed by heat. *Id.*

For materials like 1,2-dichlorobenzene, tests at Veolia show that the Destruction and Removal Efficiency ("DRE") of the Veolia incinerator is 99.99999%. *Id.* ¶ 17. Dr. Magee opines

that "it is reasonable to expect that the Veolia facility achieves a correspondingly greater DRE - on the order of 99.9999999% or greater - with respect to a Class 5 material like VX or [CVXH]." *Id.* *See also* Hr'g Tr. at 380-92 (Magee-Direct).

Moreover, according to Dr. Magee, the Army has incinerated pure or nearly-pure VX for nearly fifteen years. Magee Decl. ¶ 18. In trial burns at these incinerators, destruction of VX is confirmed. *Id.* *See also* Hr'g Tr. at 390-92. Moreover, after destruction of nearly 2,000 tons of VX via incineration, the Army has never detected VX in the incinerator stack gas effluent. Magee Decl. ¶ 18. It is Dr. Magee's opinion that even if there is VX or EA2192 in CVXH, it is at such a low concentration that VX in the incineration emissions at Veolia would be too low to measure. *Id.*

Likewise, Dr. Magee opines that given the trial burn data at the Veolia plant, Plaintiffs' allegation that incineration of VX would produce increased levels of dioxin, fine particulate matter, carbon monoxide, hydrogen chloride, carbon dioxide, oxygen, and/or sulfur dioxide are completely unfounded. *Id.* ¶¶ 25, 21, 22. In Dr. Magee's opinion, "[t]here is no scientific basis to justify continuous emissions monitoring of VX in stack emissions or in the ambient air at Veolia." *Id.* ¶ 22.

Furthermore, allegations that the nature of the emissions would change depending upon the form of the VX incinerated are without merit according to Dr. Magee because VX is completely destroyed by incineration regardless of its physical state. *Id.* ¶ 26. In other words, the susceptability of the VX molecule to thermal destruction does not change based on the molecule's physical state— solid, liquid or gas. *Id.* ¶ 27. Further, as mentioned above, the Army has incinerated pure VX for years and there has never been measurable VX in the emissions. *Id.* ¶ 18.

Finally, Dr. Magee opines that there is no need for an environmental impact study at the Veolia incinerator to assess whether this facility can safely incinerate CVXH. *Id.* ¶ 33. Dr. Magee

agrees with the Government's experts that CVXH is just like any other caustic waste of this type for which Veolia was re-permitted by TCEQ and the EPA in 2004.  *Id.*  Moreover, there is no evidence that the emissions at Veolia are out of compliance with CAA regulations or contribute appreciably to ambient air pollution in southeast Texas.  *Id.*

## II.  <u>PRELIMINARY INJUNCTION STANDARD</u>

A preliminary injunction is an extraordinary remedy that will only issue on a clear showing of need.  *See Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  The movant bears the burden of proving its entitlement to such relief. *See id.*  In order to obtain a preliminary injunction, Plaintiffs must show a likelihood of success on the merits, irreparable harm if the injunction is denied, and the inadequacy of any remedy at law. *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 896 (7th Cir. 2001).  If Plaintiffs make this threshold showing, then the Court must balance the hardship on Plaintiffs if the injunction is wrongfully denied against the hardship on Defendants if it is wrongfully granted; the Court must also consider the impact of the injunction on the public interest.  *See Ferrell v. U.S. Dep't of Housing & Urban Dev.*, 186 F.3d 805, 811 (7th Cir. 1999).  The Court must "balance the harms to both parties using a 'sliding scale' analysis:  the greater the moving party's likelihood of prevailing on the merits, the less strongly it must show that the balance of harms weighs in its favor."  *Id.* (citing *Allied Signal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 573-74 (7th Cir. 1999); *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1453 (7th Cir. 1995), *abrogated on other grounds by*, *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999); *Storck U.S.A., L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994)).

## III. <u>DISCUSSION</u>

### A. PLAINTIFFS' NEPA ALLEGATIONS

Plaintiffs' NEPA arguments can be broken up into two parts: that the Government failed to assess properly the environmental impact of production process incidents and/or process changes at NECDF; and that the Government failed to assess properly the environmental impact of its decision to transport CVXH from Newport, Indiana, to Port Arthur, Texas, and to incinerate CVXH at Veolia.

In general, the Government contends (1) that it properly assessed the environmental risks associated with its production process at NECDF, (2) that it properly characterized CVXH as a caustic hazardous waste, and (3) that compliance with IDEM, DOT, RCRA and other permitting processes with respect to transport and incineration of CVXH satisfies all necessary NEPA requirements.

The law relevant to Plaintiffs' NEPA allegations follows:

NEPA is designed "to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action." *Marsch v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) (quoting 42 U.S.C. § 4321). NEPA requires that an agency disseminate information about its proposed action such that the public and other government agencies may react to the effects of the proposed action in a meaningful time frame. *Id.* (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)).

> [A]lthough "it would make sense to hold NEPA inapplicable at some point in the life of the project, because the agency would no longer have a meaningful opportunity to *weigh* the benefits of the project versus the detrimental effects on the environment," up to that point, "NEPA cases have generally required agencies to file environmental impact statements when the remaining governmental action would be environmentally 'significant.'"

*Id.* at 371-72 (quoting *TVA v. Hill*, 437 U.S. 153, 188 n.34 (1978)).

The regulations that implement NEPA, written by the Council on Environmental Quality ("QEC"), require a supplement to an EIS or an EA if there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c). Similarly, the corresponding Army regulation that implements NEPA states:

> (1) Supplemental NEPA documentation is required when:
>
> > (i) The Army makes substantial changes in the proposed action that are relevant to environmental concerns; or
> >
> > (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impact.
>
> (2) This review requires that the proponent merely initiate another "hard look" to ascertain the adequacy of the previous analyses and documentation in light of the conditions listed in paragraph (g)(1) of this section. If this review indicates no need for new or supplemental documentation, a REC can be produced in accordance with this part. Proponents are required to periodically review relevant existing NEPA analyses to ascertain the need for supplemental documentation and document this review in a REC format.

32 C.F.R. § 651.5. An agency must apply these standards using a "rule of reason" approach. *See Marsh*, 490 U.S. at 373. "Application of the 'rule of reason' . . . turns on the value of the new information to the still pending decisionmaking [sic] process." *Id.* at 374.

There are actions that are categorically excluded from the EIS process. *See* 40 C.F.R. § 1508.9; 23 C.F.R. § 771.115; *Ind. Forest Alliance, Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 856 (7th Cir. 2003). The Army defines these so-called "categorical exclusions" as

> actions that normally do not require an EA or and EIS. The Army has determined that they do not individually or cumulatively have a substantial effect on the human environment. Qualification for a [categorical exclusion] is further described in Subpart D and Appendix B of this part. In accordance with § 651.29, actions that degrade the existing environment or are environmentally controversial or adversely affect environmentally sensitive resources will require an EA.

41

32 C.F.R. § 651.5.  Further, the Army includes in its list of categorical exclusions certain hazardous materials/hazardous waste management operations.  32 C.F.R. § 651.28.  Specifically, the Army lists as a categorical exclusion the following:

> Routine management, to include transportation, distribution, use, storage, treatment, and disposal of solid waste, medical waste, radiological and special hazards (for example, asbestos, PCBs, lead-based paint, or unexploded ordinance), and/or hazardous waste that complies with EPA, Army, or other regulatory agency requirements.  This [categorical exclusion] is not applicable to new construction of facilities for such management purposes.

*Id.* § 651.28(h)(4).

The Court's review of the Government's decision-making process under NEPA is limited by the Administrative Procedures Act (the "APA").  Under the APA, the Court may "set aside agency action only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'"  *Highway J Citizens Group v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003) (quoting 5 U.S.C. § 706(2)(A)).  The Court must only ask "whether the decision was based on consideration of the relevant factors and whether there has been a clear error of judgment."  *Marsh*, 490 U.S. at 478.  The Court must give deference to an agency's factual findings when it decided whether or not the environmental impacts of its actions were significant.  *Id.*  In other words, the Court may not "substitute its own judgment for that of the agency as to the environmental consequences of its actions."  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).  The Seventh Circuit has stated that "'[t]he only role' for a court in applying the arbitrary and capricious standard in the NEPA context 'is to [e]nsure that the agency has taken a "hard look" at environmental consequences.'"  *Highway J Citizens Group*, 349 F.3d at 953 (quoting *Kleppe*, 427 U.S. at 410 n.21).

42

Under the APA a Court's review is generally limited to the administrative record before the agency when it made its decision. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973). However, if the agency record fails to explain the administrative action such that judicial review is frustrated, the Court may "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." *Id.* at 142-43.

The Court applies these standards to each of Plaintiffs' NEPA allegations in turn.

## 1. Production Process Incidents and/or Changes

With respect to Plaintiffs' argument that the Government violated NEPA when it failed to assess properly the environmental impact of new information revealed from process incidents or from process changes at NECDF, the Court concludes that Plaintiffs have failed to show they are likely to succeed on the merits. Plaintiffs' argue that the Government failed to consider scientific evidence that VX may form or reform in CVXH over time. Plaintiffs contend that the unexplained VX and EA2192 findings from the spill and leak incidents at NECDF, coupled with the findings in the Brickhouse study and the CMA VX-reformation study should have led the Army to at least perform an EA of the hydrolysis process to ensure that it had properly evaluated the risks associated with formation or reformation of VX in CVXH. In addition, Plaintiffs claim that this problem is compounded by the fact that the Army has knowingly failed to analyze or calculate the VX concentration in the organic layer of CVXH.

The Court concludes that the content of the administrative record and the testimony at the hearing in this cause reflect that the Army made its determination that VX neither forms or reforms in CVXH such that it would render CVXH harmful from agent properties by assessing all of the available scientific data on formation and reformation of VX. Both Dr. Irvine and Dr. Kavanagh

43

testified that they were aware of the Brickhouse study and did not find it persuasive evidence that VX formed in CVXH.  Hr'g Tr. at 506-29; 585-92.  Rather, both experts testified that the results of the Brickhouse study were obtained in a significantly different environment than that of stored CVXH.  *Id.* at 523, 586-90.  Dr. Kavanagh specifically addressed Plaintiffs' contention that VX could form or reform in the organic layer of the CVXH and opined that the chemical make up of that layer was such that VX could not form or reform in that layer.  *Id.* at 607.  Moreover, contrary to Plaintiffs' contention, the CMA VX-reformation study concluded that VX will not form or reform in CVXH.  Pls.' Hr'g Ex. 9, at 6 & 16.  Dr. Irvine, who contributed to that report, testified that this was the case.  Hr'g Tr. at 518-19.  Finally, Dr. Kavanagh testified that even after he analyzed the data from the two incidents of high VX and high EA2192 readings, the subsequent testing of the ISO containers convinced him that his and the Army's earlier conclusion that VX would neither form or reform in CVXH was correct.[12]  Hr'g Tr. at 591.

The only evidence to the contrary, then, is Dr. Sommer's testimony in which he claimed that when looking only at the organic layer of the CVXH, it is possible to recreate conditions similar to that of the Brickhouse study, and VX could reform.  *Id.* at 320-21, 330-31, 336-40.  The Court was not persuaded, however, that Dr. Sommer could appropriately testify to whether or not VX would form or reform in any solution because his expertise is in analysis of materials, not in the chemistry

---

[12] At the hearing, Plaintiffs made much of the fact that Dr. Kavanagh's assessment of the two spill incidents took place eleven months and six months after the occurrences.  Hr'g Tr. at 600-01.  However, the Army's obligation to assess the potential environmental impacts and the Court's review of the Army's analysis does not stop after the Army has determined it will proceed despite the new data.  *Cf. Highway J Citizens Group*, 349 F.3d at 959 (discussing the importance of looking at analyses done after and EA/FONSI based on new information that brings issues into sharper focus after the initial findings to ensure that the agency to the necessary "hard look").  Rather, scientific, post-incident review can serve to validate the agency's decision that there is no significant environmental impact.  *See id.*

of making them or destroying them.  Furthermore, there is evidence in the administrative record that the Army considered the difference in VX concentration in the organic layer versus in the reactive mixture.  Admin. R. Doc. Nos. 37 & 38.  This evidence coupled with the testimony of Dr. Irvine and Dr. Kavanagh, both of whom have acted as advisors on the VX hydrolysis process at NECDF for a considerable period of time, and both of whom have expertise in the chemistry applied in the hydrolysis process, lead to only one conclusion:  the Army properly considered all the available evidence when it concluded that CVXH safely could be classified as a caustic hazardous waste, in part, because VX could not and would not form or reform in CVXH.

To the extent that Plaintiffs challenge the Army's use of a REC to explain its findings with respect to the loading arm incident or the leaking valve incident, the Court finds no error in the Government's decision-making process in this regard under NEPA.  For both instances the Government made analyses, considered the documented studies on formation or reformation of VX in CVXH,  and concluded that there was no new environmentally significant impact.  *Id.* Doc. No. 42, at 2-4; Hr'g Tr. at 119-20, 122, 154-56, 576-79, 581-83.  The Court has already concluded that the Government's analysis regarding formation or reformation was not arbitrary or capricious.  Moreover, the Government's subsequent testing of the ISOs that contained CVXH from the questionable equipment confirmed that the VX and EA2192 concentrations still met the Government's clearance criteria.  Hr'g Tr. at 576-79, 581-83.  Dr. Kavanagh testified that after reviewing this data, he was confident that CVXH posed no new threat to humans or the environment.  *Id.*  The fact that the Government relied upon experts who view the data differently than Plaintiffs does not, alone, invalidate its decision-making process.  *Highway J Citizens Group*, 349 F.3d at 956-57.  The Government's decision that these incidents posed no new significant threat,

therefore, pursuant to 32 C.F.R. § 651.5 nothing more than a REC was required.  The Court concludes that the Government took the necessary "hard look" at this issue as required by NEPA.

Plaintiffs also contend that the Army's classification of CVXH as a hazardous waste is fundamentally flawed because the Army does not properly test for VX and/or EA2192 in CVXH. Plaintiffs assert that the Army's decision to depart from its previously-applied quality control ("QC") method for testing for the concentration of VX and EA2192 in CVXH should have prompted the Government to perform an EIS or an EA.  Dr. Sommer testified that the modified method for detection of VX and EA2192 in CVXH provides meaningless date because it does not follow an EPA test procedure.  Hr'g Tr. at 333.  Dr. Irvine testified that he believed there were potential problems with the modified method that led him to conclude the Army should refrain from implementing it.  *Id.* at 477-502.  *See also* Pls.' Hr'g Ex. 13.

The evidence in the record shows that the Army assessed the impact of using the modified method before it made the decision to change its quality control procedure.  Dr. Irvine, Colonel Barber, and Dr. Kavanagh all testified that scientists disagreed on the efficacy of the modified method.  *Id.* at 76, 87, 524, 592-96, 615-16.  Dr. Kavanagh specifically discussed the fact that the process at NECDF for testing for VX and EA2192 has never been the EPA standard method, rather, the method had to be developed in cooperation with the EPA to ensure its efficacy for testing for nerve agents.  *Id.* at 597-98.  Furthermore, it is the Court's impression, from Dr. Irvine's overall testimony, that after the CDC evaluated the relevant data and approved implementation of the modified method, Dr. Irvine was satisfied that CVXH "cleared" using that method would not endanger the environment and was properly classified as a hazardous waste.

The Army sought and received scientific advice about the proper method for detection of VX and/or EA2192 in CVXH, and made a decision based on scientific principles, this Court cannot and

will not substitute its judgment, or that of Dr. Sommer, for that of the Government regarding the appropriate test method for residual VX and/or EA2192 in CVXH.  *Cf. Highway J Citizens Group*, 349 F.3d at 956-57 (stating that an agency need not change its decision on its plan just because there is a difference of opinion about its environmental significance).  On the current record, the Court concludes that the Government took the necessary "hard look" at environmental impacts of the hydrolysis process, including the method for measuring for residual VX and EA2912 in CVXH, as required by NEPA.

The third challenge to the Government's decision that a process change had no significant environmental impact is Plaintiffs' claim that the Government failed to assess properly the environmental risks associated with venting volatile organic compounds to the atmosphere to reduce the flammability of CVXH.  Plaintiffs contend that this was a significant change because it affected the amount of VOCs NECDF sent to its release stack.  However, the evidence presented at the hearing shows that the Government properly assessed the environmental impact of the additional VOCs.  Colonel Barber testified that in the start-up phase of the NECDF process, the Army realized that CVXH produced at that time was flammable; an unacceptable result given the Army's commitment to the public that CVXH would not be flammable.  Hr'g Tr. at 83, 98.  Taking a pause in production, the Army's evaluation revealed that VOCs created during the hydrolysis process were the cause of the flammability results.  *Id.* at 83-84, 217-18.  The solution was to vent the VOCs to NECDF's existing stack and to add a flammability test to the clearance criteria for CVXH to ensure compliance with the Army's prior commitment.  *Id.* at 84-85, 98, 217-18.  Testing on the stack effluent revealed that there was an increase in methane and acetone in the stack, neither of which require a permit to vent, but no appreciable difference in the amount of VOCs.  *Id.* at 218-20.  Although NECDF has had to change its stack carbon filters more frequently than originally

anticipated and the Army has added additional sampling devices to the stack at NECDF, the Army's evaluation of the stack effluent revealed no need to seek a change in the facility's CAA permit. *Id.* at 221-23.

Other than speculation, Plaintiffs presented no evidence that the Army failed to assess the environmental impact of venting VOCs created in the hydrolysis process to its existing stack and under its existing CAA permits. The Court concludes that the Government's decision not to supplement its earlier 2002 FEA and 2002 FONSI related to the destruction of VX via hydrolysis because of this process change was not unreasonable, arbitrary or capricious.

In summary, the Court concludes that Plaintiffs have failed to demonstrate a likelihood of success on the merits of their claim that the Government violated NEPA when it failed to supplement its 2002 FEA because of production process incidents or production process changes that occurred in 2005 or afterward.

### 2. Transportation to & Incineration at Veolia

Plaintiffs also challenge the Government's decision to proceed with shipments of CVXH from NECDF to Veolia without performing an EA or an EIS. Plaintiffs contend that the Army's reliance on its characterization of CVXH as a hazardous waste that is subject to its categorical exclusion from performance of an EA or an EIS fails take the appropriate "hard look" at the potential environmental impacts of accidents, terrorism or explosions en route. For the same reasons, Plaintiffs contend that the Government failed to consider alternative secondary-waste treatment technologies as required by NEPA. The Plaintiffs point out that the most troubling aspect of the Government's decision with respect to shipment of CVXH to Veolia for incineration is the

apparently short time in which the Government made this decision and the lack of transparency to the public in the decision-making process.

Although the Court can agree with Plaintiffs that the lack of transparency in the later part of the decision-making process in this case is troubling in light of the goal of NEPA to ensure public input into the process, the Court cannot conclude that the Government's environmental assessment process here was unreasonable, arbitrary or capricious.  It is important to look at what the July 2002 FEA and the October 2002 FONSI disclosed to the public about the Army's plans for disposal of CVXH from NECDF.  Likewise, it is also important to look at what the Army considered when it issued the April 2007 REC in which it announced that it had decided to commence shipment of CVXH to Veolia for incineration.

The 2002 FEA specifically evaluated two treatment options for CVXH going forward: (1) storage of CVXH at NECD pending resolution of problems associated with the SCWO process and (2) shipment of CVXH to an off-site TSDF.  Admin. R. Doc. No. 3, § 1.  Although the FEA made no site-specific findings with respect to a TSDF, the FEA affirmatively disclosed that CVXH would be classified as a hazardous waste under Indiana regulations.  *Id.* (citing Appendix B).  The FEA also stated that "the permitted off-site TSDF selected for treatment and disposal of NECDF waste streams would be audited to ensure that the facility is safely treating the hydrolysate in accordance with applicable federal, state, and local regulations and the TSDF's environmental operating permits."  *Id.* § 1.2.

The FEA was provided to the public for comment, as was the corresponding October 2002 FONSI regarding the Army's decision to ship CVXH to a permitted TSDF.  *Id.* § 5; *id.* Doc. No. 4, at 3.  The only public comment received on either document was a concern about the type of off-site disposal method the Army might choose (specifically, incineration or deep-well injection); there

were no public objections to the classification of CVXH as a hazardous waste or to the Government's decision that off-site shipment and treatment was more safe than on-site storage. *Id.* Doc. No. 4, at 3.

The first administrative document specific to the shipment of CVXH from NECDF to Veolia's facility in Port Arthur, Texas, is the April 2007 REC. *Id.* Doc. No. 5. The REC announces that shipment of CVXH was to commence and that CVXH was classified for purposes of shipment as a caustic hazardous waste. *Id.* at 1-3. The REC also disclosed that the original plan to transport CVXH to either Dayton, Ohio, or Deepwater, New Jersey, was in the process of being analyzed for whether or not the Army needed to supplement the 2002 FEA. *Id.* at . The REC stated:

> Initially, the Army sought to transport the NECDF hydrolysate to a Dayton, OH[,] TSDF. This facility could not obtain the necessary permits to dispose of the waste water that were determined necessary in the NECDF 2002 EA. There were also environmental justice concerns regarding minority and impoverished populations surrounding the Dayton, OH[,] facility. The Army then considered transporting the NECDF hydrolysate to a Deepwater, NJ[,] facility for destruction. Due in part to concerns from the local communities about the potential impact of the liquid effluent from the biotreatment facility into the Delaware River the CDC and the EPA prepared a report, *"Review of the U.S. Army Proposal for Off-Site Treatment and Disposal of Caustic VX [H]ydrolysate from NECDF."* The Army began analyzing this potentially significant new information to determine if it needed to supplement the NECDF 2002 EA. The Army's experience and environmental analysis with the destruction of VX and derived waste has been using incineration. The proposal to use DuPont involved the use of a biotreatment facility and raised concerns regarding the Delaware River and the discharge of effluent into the estuary. The analysis was discontinued when the Deepwater, NJ[,] facility announced it would not be able to obtain the necessary permits to accept the hydrolysate, and would therefore not participate in the proposal.
>
> The TSDFs being considered operate a fully-permitted incinerator capable of destroying the NECDF caustic waste water and will not have to modify there [sic] permits in order to accept and destroy the NECDF caustic waste water. There will not be any liquid discharge from the incineration process at the TSDFs being considered. To date the Army's Chemical Material Agency (CMA) has safely incinerated over 2000 tons of nerve agent VX. In addition to VX, CMA has routinely incinerated large quantities of VX decontamination solution generated from decontaminated VX contaminated buildings, structures and equipment.

50

*Id.* at 4-5.   The REC concluded that the Army's current plan would "create no significant environmental impacts.   There is no new information or circumstances that would require supplementation of previous NEPA documents."   *Id.* at 6.

Colonel Barber testified at the hearing that the public input into the Army's decision to transport CVXH to Port Arthur and to incinerate that CVXH at Veolia occurred in Newport, Indiana, on April 16, 2007, after he had a signed contract with Veolia to incinerate the material.   Hr'g Tr. at 39.   Colonel Barber also testified that he believed Veolia had a public meeting regarding its intent to enter into a contract with the Government to incinerate CVXH some time in March 2007.   *Id.* at 43-44.

On May 18, 2007, CMA published the Army TSP for transport of CVXH from NECDF to Veolia.   *Id.* Doc. No. 39.   The plan recommended a single route for transport of CVXH; there is no mention of the evaluation of alternatives.   *Id.* at 8.   The Army TSP cites no analysis of terrorism risks, rather it focuses on risks associated with accidents and leaks.   *Id.* at 7-9, 11.   Similarly, on June 8, 2007, Veolia published its TSP, which also focused on environmental contamination risks associated with an accident or leak.   *Id.* Doc. No. 40, at 1, 9-15.

The June 2007 REC addressed the risk of theft of CVXH and the subsequent reformation of VX.   *Id.* Doc. No. 42, at 4-5.   The June 2007 REC states that this possibility "was not considered previously, [sic] because this scenario is too remote."   *Id.*

Based on this record, the Court must conclude that the Army properly characterized CVXH as a hazardous waste, properly applied the appropriate NEPA regulatory scheme to its decision-making process, and was not unreasonable, arbitrary or capricious in its decision to not supplement the 2002 FEA and 2002 FONSI before it began shipments of CVXH to Veolia for incineration. First, as the Court has already discussed at length in the previous section, although there may be

51

some scientific debate about the proper method of analysis of the concentration of VX and EA2192 in CVXH, the Army properly considered all of the available evidence when it concluded that CVXH is a caustic hazardous waste. The Army's experts, Dr. Irvine and Dr. Kavanagh, testified at the hearing that, despite the process upsets and QC changes that have taken place since NECDF started the hydrolysis process, they are confident that the health and safety risks of CVXH have been evaluated. Hr'g Tr. at 524, 531, 579-83, 595. These opinions were rendered even after analysis of all of the incidents that Plaintiffs claim should have given rise to further study by the Government.

The public disclosure of the Army's classification of CVXH as a hazardous waste coupled with the testimony at the hearing by Dr. Irvine and Dr. Kavanagh that they are confident there is no possibility that VX forms or reforms in CVXH, and Dr. Kavanagh's testimony that there has been nothing in the actual process implemented at NECDF to date that would change his opinion that CVXH is classified properly as a hazardous waste, leads this Court to conclude that the Army's decision to so classify CVXH was neither arbitrary nor capricious. The Army properly considered all the available evidence and properly disclosed its conclusion to the public in the 2002 FEA and 2002 FONSI as required by NEPA.

Because the Army properly classified CVXH as a hazardous waste, its decision to follow its own regulations to find that the shipment of CVXH was categorically excluded from those actions that require either an EIS or an EA, also comported with NEPA. It is clear from the statutory framework that each agency is allowed to define what actions would fit the definition of a categorical exclusion. 40 C.F.R. § 1508.9; 23 C.F.R. § 771.115; 32 C.F.R. §§ 651.5, 651.28. There was neither evidence presented to the Court nor argument made to the Court that the Army's rule-making procedure was constitutionally or otherwise flawed such that the Court could review the

Army's definition of categorical exclusions.  Therefore, the Court must conclude that the Army's use of the categorical exclusion in this case was not arbitrary and capricious.

Plaintiffs argue that the Army's justification of terrorism for looking at alternative disposal methods to on-site SCWO makes the Army's failure to assess the terrorism risks associated with shipping CVXH to Veolia a violation of NEPA.  The 2002 FEA specifically stated that the Army was considering an accelerated disposal option to reduce the risk associated with prolonged storage of VX at NECD.   Admin. R. Doc. No. 3, at § 1.2.  As pointed out by Plaintiffs, the 2002 FEA specifically mentions that the threat of future terrorist attacks on the United States prompted the Army to look at alternative disposal methods for the VX stored at NECD.  *Id.* at 1-3 ("Action is needed to reduce the time for destroying the NECD stockpile of agent VX.  Accelerating destruction of the VX stockpiled at NECD contributes to improved public safety by more quickly removing the risks of continued storage of VX (e.g., risks of VX releases caused by accidents, natural disasters, and acts of terrorism).").  The 2002 FEA specifically evaluates the risks associated with transportation of CVXH from Newport to an off-site permitted TSDF versus long term storage at NECD.  *Id.* at § 3.36.  Implicit in this analysis, then, was the Army's consideration of the risks associated with terrorists attack on the VX stockpile versus the risks inherent in shipping CVXH, a hazardous waste, off site for further treatment.  In the 2002 FEA, the Government concluded that the accelerated disposal option best protected the safety and well being of the public, NECD personnel, and the environment.  *Id.* ¶ 4.

Moreover, between October 2002, and April 2007, the Army considered several transportation analyses regarding the accident risks associated with shipments of CVXH.  *See* Admin. R. Doc. Nos. 33, 24, 16, 15, 13, 8, 34, 9.  Although those transportation analyses were not directed to shipments from Newport, Indiana, to Port Arthur, Texas, they laid the foundation for the

transportation assessments later performed for that route.  *See id.* Doc. Nos. 39, 40.  Included among

these documents is the 2005 CDC Report in which the CDC opined that "[t]he precautions in the

transportation plan are adequate to protect the public."  *Id.* Doc. No. 8, at 1 ("Major Findings" box).

*See also id.* at 1 ("The transportation plan meets [DOT] regulations, and precautions in the plan are

adequate to protect the public, personnel, and [the] environment.").  The fact that Plaintiffs disagree

with the Army's assessment of the terrorism risk is not determinative of whether the Army's

decision was arbitrary and capricious.  *Accord Highway J Citizens Group*, 349 F.3d at 956-57

(discussing the propriety of an agency not accepting the view of citizens groups opposing the

agency's plan of action).  Here, the Army looked at available data and made a reasoned decision that

shipment of CVXH to an off-site TSDF was better for the environment and for the human

population than long-term storage at NECD.  On this record, this Court cannot conclude that the

Army's decision in that regard was unreasonable, arbitrary, or capricious.

Plaintiffs also argue that the Government's failure to perform a  site-specific EA or EIS for

transport of CVXH to Veolia, and incineration of CVXH at Veolia violates NEPA.  The Court

agrees that the TSPs prepared for the Newport to Port Arthur route and the corresponding impact

analysis on the Port Arthur area lacks the detail of that done by the Government for the

bioremediation-type treatment option; however, the Court cannot conclude that this lack of detail

evidences a violation of NEPA.  The April 2007 REC implies that the Army's unfamiliarity with

the bioremediation-type disposal process caused it to carefully consider whether it needed to

supplement the 2002 EA.  Admin. R. Doc. No. 5, at 4.  Furthermore, as disclosed in the April 2007

REC, the Government decided it did not need to pursue either an EIS or an EA to ship CVXH to a

permitted incineration facility because of the Government's prior experience in safely incinerating

VX and VX-contaminated waste, and because the original disposal plan for VX was on-site

incineration and the earlier FPEIS had issued based on that plan. *Id.* at 5. Moreover, the 2002 FEA and corresponding FONSI specifically disclosed the Army's decision to transport CVXH off site for further treatment at a permitted TSDF. *Id.* Doc. No. 3, at 1-2; *id.* Doc. No. 4, at 3. There was testimony at the hearing that confirmed the Government's assertion that it had safely incinerated VX. Hr'g Tr. at 388-89. Moreover, the only admissible testimony regarding the ability of Veolia to safely incinerate CVXH was that of Dr. Magee. *Id.* at 387-400, 422-27. Dr. Magee opined that Veolia's facility could safely incinerate CVXH, that it was permitted properly to do so, and that its emissions would not significantly impact the environment surrounding the plant. *Id.* at 422-27; Magee Decl. ¶¶ 33-35. Plaintiffs raise the spectra of environmental justice concerns in the area surrounding the Veolia incinerator, however, other than Dr. Magee's testimony that the area adjacent to the Veolia facility is the relatively affluent community of Taylor Landing, Magee Decl. ¶ 34, the Court has no information from which to conclude that these concerns were not adequately addressed by the EPA and the TCEQ during the repermitting process in 2004.

In summary, given the following facts: (1) the regulatory scheme that allows the Army to categorically exclude certain activities from further NEPA analysis; (2) the significant analysis that went into preparation of the 2002 FEA; (3) the subsequent analysis of the risks of shipment of CVXH done by the CDC in 2004 and 2006, and the Army's consideration of those analyses; (4) the continual assessment of NECDF's clearance procedures for CVXH; (5) the Government's experience in safely incinerating VX and VX-contaminated waste; (6) the rigorous permitting process required for Veolia's incinerator in 2004, and the subsequent analysis of the efficacy of that process for incineration of CVXH by an expert; the Court must conclude that the Government took the necessary "hard look" at the environmental impact of its plan to ship CVXH to Veolia for incineration that is required by NEPA. Moreover, based on the criteria set forth in 32 C.F.R. §

651.5, 40 C.F.R. § 1508.9, and 32 C.F.R. § 651.28(h)(4), the Army was not required to supplement the 2002 FEA with more than a REC when it decided to ship CVXH to Veolia for incineration.

For the foregoing reasons, the Court concludes that Plaintiffs have failed to show they are likely to succeed on the merits of their NEPA claims.

## B.  PLAINTIFFS' REMAINING ALLEGATIONS

Plaintiffs also bring claims under RCRA, the DAA, and Indiana's environmental waste statutes.  The bases for these claims is that the Army's classification of CVXH as a caustic hazardous waste creates an unreasonable risk of harm to humans and to the environment in the transport and incineration of the waste water.  The Court has already considered these arguments in the context of Plaintiffs' NEPA claims and determined that the scientific basis for the Army's classification is reasonable and sound.  For this reason, the Court concludes that Plaintiffs have failed to show they are likely to succeed on the merits of its remaining environmental claims.

## C.  SUMMARY

The Court concludes on the record before it that Plaintiffs have failed to show a likelihood of success on the merits of their claims that Defendants' shipment of CVXH from Newport, Indiana, to Port Arthur, Texas, and subsequent incineration of CVXH at Veolia violates NEPA, RCRA, the DAA, or Indiana and Texas RCRA-based statutes.  Because the Court concludes that Plaintiffs cannot make the requisite showing on this factor, the Court need not discuss the other factors for a preliminary injunction because a party must satisfy all three threshold requirements before a Court will balance the interests of the parties and weigh the impact on public interest.  *See Cooper*, 196 F.3d at 813.  For this reason, Plaintiffs' Motion for Preliminary Injunction must be **DENIED**.

## IV.  **CONCLUSION**

For the foregoing reasons, Plaintiffs', the Sierra Club, the Chemical Weapons Working Group, Citizens Against Incineration at Newport, Community In-Power Development Association, Sara Morgan, Leonard Akars, Hilton Kelley, Moya Green and Anisha Swallow, Motion for Preliminary Injunction is **DENIED**.

IT IS SO ORDERED this 3rd day of August, 2007.


LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana


Electronically distributed to:

Richard E. Condit
r1condit1@earthlink.net

Robert Herschel Foster
US DEPARTMENT OF JUSTICE
robert.foster2@usdoj.gov

Gregory M. Gotwald
PLEWS SHADLEY RACHER & BRAUN
ggotwald@psrb.com

Alan David Greenberg
U.S. DEPARTMENT OF JUSTICE
alan.greenberg@usdoj.gov

Mick G. Harrison
mickharrisonesq@earthlink.net

George M. Plews
PLEWS SHADLEY RACHER & BRAUN
gplews@psrb.com

Peter M. Racher
PLEWS SHADLEY RACHER & BRAUN
pracher@psrb.com

Rudolph William Savich
rsavich@aol.com

Sue A. Shadley
PLEWS SHADLEY RACHER & BRAUN
sshadley@psrb.com

Grieg R. Siedor
Veolia ES Technical Solutions, LLC
greig.siedor@veoliaes.com

Barry Alan Weiner
US DEPT OF JUSTICE
barry.weiner@usdoj.gov

Jill E. Zengler
UNITED STATES ATTORNEY'S OFFICE
jill.zengler@usdoj.gov